No. 70,231

STATE OF KANSAS, *Appellee*, v. DONALD W. ROWELL, JR.,
*Appellant*.
(883 P.2d 1184)

Opinion filed
November 4, 1994.

*Charles A. O'Hara,* of O'Hara, O'Hara & Tousley, of Wichita, argued the cause and was on the brief for appellant.

*Jennifer M. Wieland,* assistant county attorney, argued the cause, and *Mary A. McDonald,* county attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is a child abuse first-degree murder and rape case. Donald W. Rowell, Jr., was convicted of first-degree murder (K.S.A. 1991 Supp. 21-3401) and rape (K.S.A. 21-3502). The victim is the defendant's 16-month-old daughter. The defendant contends that the district court placed an unfair limitation on his theory of defense, that his counsel infringed on his right to testify, that the evidence of his guilt was insufficient to support the verdict, and that he was improperly charged with rape rather than aggravated incest.

Our jurisdiction is under K.S.A. 1993 Supp. 22-3601(b)(1) (a direct appeal upon imposition of a maximum sentence of life imprisonment).

We affirm the conviction of first-degree murder. We vacate the sentence for rape and remand for resentencing for one count of aggravated incest.

### Facts

Because Rowell questions the sufficiency of the evidence, the facts are set out in detail. Rowell had custody of his three daughters following a divorce. Angela Lechner began babysitting for Rowell in September 1991. Rowell usually delivered his daughters, K.R., age 5, T.R., age 3, and A.R., the victim, age 16 months, to Lechner around 5:00 or 5:30 a.m. He normally returned around 6:00 or 7:00 p.m., or later.

On December 19, 1991, Rowell arrived at Lechner's house between 5:00 and 5:30 a.m. T.R. and A.R. were crying. Lechner asked T.R. why she was crying. The child replied, " 'Daddy spanked me.' " Rowell said, " 'I spanked her because she didn't want to wear the clothes she had on.' " Lechner asked, " '[A.R.], why are you crying?' " and Rowell responded, " 'The hell with it, she'll shut up in a minute,' " and left the house.

Lechner was able to calm T.R. and A.R. Lechner laid A.R. in the crib, placed K.R. and T.R. on the couch, and went back to her room to lie down. The girls went to sleep. Lechner got up with her husband around 6:15 a.m., and he left for work around 6:30 or 7:00 a.m. She woke her older son up for kindergarten and loaded him onto the bus at approximately 7:45 a.m. Lechner fixed breakfast for the other children around 8:30 or 9:00 a.m.

Lechner woke up A.R. around 10:00 or 10:15 a.m. Lechner said that A.R. looked pale and seemed weak, as if she were sick. A.R.'s appearance did not alarm Lechner because the child recently had been in the hospital and was on medication. Lechner dressed A.R. and attempted to feed her breakfast. The child would not eat.

Around 11:30 a.m., Lechner took the children with her to school to pick up her son. Upon returning, she placed A.R. and her 8-month-old son on the floor in the living room with some toys. A.R. was pale and weak. Lechner then went to the kitchen. When she returned, A.R. was standing with her head hanging down. The child was looking at the floor. Lechner sat in a nearby chair. When she looked up, A.R. collapsed, face down on the floor. Lechner ran over to A.R. She noticed that A.R. was having trouble breathing and the child's eyes were rolling back into her head.

Lechner was frightened and did not know what to do. She phoned her sister-in-law, Dana, and told her to come over as soon as possible because something was wrong with A.R. Lechner phoned 911 for an ambulance. A.R. turned light blue in color and began jerking or flopping her arms and legs. Dana administered CPR to A.R. A.R. stopped breathing. The ambulance arrived. Technicians worked on A.R., before transporting her to the Newton Medical Center. Lechner called Rowell at work to notify him of A.R.'s situation. Rowell proceeded to the hospital. A.R. was not breathing adequately to sustain life and her heart rate was too slow. The medical technician did not notice any external injuries.

The emergency room personnel called Dr. Jonathan Jantz, the pediatrician on call, at 12:59 p.m. on December 19, 1991, for a

code blue coming in on the ambulance, "code blue" meaning serious injury but still alive. Dr. Jantz did not observe any external injuries. He tested A.R.'s hemoglobin level and found that it was dangerously low. The test suggested she was bleeding internally.

Dr. Jantz did not expect A.R. to live through the day. He was discussing A.R.'s condition with Rowell as they went into the child's room, when Rowell began to explain a vaginal laceration discovered earlier by another physician. Rowell said that the vaginal laceration occurred when A.R. fell straddling the crib. Dr. Jantz testified that he believed Rowell's comments were out of place. He had called Rowell into the room to see A.R., who was dying. According to Dr. Jantz, he interrupted Rowell and asked whether Rowell wanted a chance to hold A.R.'s hand. Rowell picked up the child's hand for a moment and then left the room.

A decision was made to take A.R. to Wesley Medical Center in Wichita for further treatment. A.R. died en route shortly after 3:00 p.m. When Dr. Jantz informed Rowell of A.R.'s death, Rowell told Dr. Jantz that A.R. had been fine when he dropped her off at Lechner's house that morning.

Dr. Scamman performed an autopsy and observed bruising in the lower left side of A.R.'s chest and in her back at about the same level. He noted some fresh tears of the vaginal opening, which he estimated were less than 24 hours old. He discovered two broken rib bones that were healing. The healing was consistent with the injuries being approximately two weeks old. When Dr. Scamman opened the abdomen, he noticed a large amount of fresh blood that should not have been there, suggesting to the doctor that there had been trauma to the area. He discovered that there was a tearing of the mesentery of the stomach and of the transverse colon. Dr. Scamman also found A.R.'s pancreas torn in half. The doctor determined that pancreatic enzymes had been released into the abdomen. He believed the injury related to the enzyme release was a week or more old. Dr. Scamman discovered other fresh internal injuries along the vertebral column and the peritonea (the lining of the abdominal cavity) which probably would have caused bleeding. He believed these injuries were associated with a recent blow to the abdomen.

Dr. Scamman testified that, given the nature of the bruising, A.R.'s ribs probably were broken by a force, such as finger pressure. He conducted an internal examination of the vagina and discovered several fresh tears he believed were less than 24 hours old. He indicated that the tears were consistent with a stretching of tissue caused by an insertion into the vagina. He did not believe that a fall could cause the internal vaginal tears.

Dr. Scamman estimated that the abdominal injuries would have occurred 6 to 18 hours before A.R.'s collapse. If A.R. collapsed at approximately 11:30 a.m., the injuries would have been inflicted before 5:30 a.m. He also said that following the injury, A.R. would not have eaten because of blood in the abdominal cavity and the pancreas rupture.

Dr. Scamman found a torn membrane across the top portion of the brain. He also discovered a Y-shaped healed fracture at least 6 weeks old of the skull bone at the base of the brain. The skull had been hit against something hard.

According to Dr. Scamman, A.R. died from blood loss caused by a sharp or forceful blow to the upper abdomen. The blow caused a tearing of the stomach mesentery and the transverse colon, the rupture of the pancreas, splitting of the tissues next to the aorta, and disruption of small arteries off the back of the aorta. In Dr. Scamman's opinion, considering the multiple traumas, A.R. had been the victim of a pattern of child abuse.

Dr. Jantz testified that a forceful blunt blow, probably a punch or kick by an adult male, caused the injuries to A.R.'s abdomen. Dr. Jantz said that he had observed an amount of hemorrhaging similar to what A.R. had experienced when a child had fallen from a three-story building and when a car rolled over a child's abdomen. He also believed that most women would not be strong enough to have hit A.R. hard enough to cause her injuries.

In February of 1991, Rowell had filed for divorce and A.R.'s mother left the family residence. At that point she had visitation with her children on Thursday nights and on alternate weekends. A.R.'s mother had first noticed, in April or May of 1991, bruising on A.R.'s forehead and a bald spot on the back of her head. When questioned about the injuries, Rowell explained the hair loss as

normal and the bruises as associated with learning to walk. A.R.'s mother also observed a bruise on the top of A.R.'s vagina. Rowell explained that A.R. had fallen straddling the bars of the crib. A.R.'s mother said that before she was forced to leave home when Rowell filed for divorce, A.R. was a normal, happy baby. After that time, A.R. was afraid and did not like taking a bath or having her diaper changed.

A few weeks after she began caring for the Rowell children, Lechner became suspicious that someone had been hurting A.R. A handful of A.R.'s hair came out from the back side of her head while Lechner was giving her a bath. Lechner phoned Rowell, who came and picked A.R. up and told Lechner that he was taking the child to the doctor. The next morning, Rowell explained that the doctor had said that the hair falling out was normal. A.R.'s physician denied having treated her for hair loss or bruises to the head. Lechner later noticed large, dark-colored bruises on the back of A.R.'s head where the hair had fallen out. Lechner also discovered a dark bruise on A.R.'s vagina at the time when A.R.'s hair had been falling out. Once while changing A.R.'s diaper, Lechner observed blood coming from the child's vagina. Lechner phoned Rowell and told him they needed to take A.R. to the doctor because she was bleeding in her diaper. Lechner took A.R. to an emergency room at a Wichita hospital, where she met Rowell. Rowell told the doctor that A.R. had fallen.

Lechner testified that she believed someone was hurting A.R. when she noticed that whenever she changed a diaper, the child seemed scared. A.R. would turn her head, tense up, and sometimes cry. Lechner again noticed vaginal bleeding a couple of days after A.R. had been to the doctor. She phoned Rowell and met him at a doctor's office in Wichita. According to Lechner, the doctor looked at A.R. and said, " 'This child has been molested.' " Rowell responded, " 'That's what I thought.' " The doctor said he was going to have to report the incident to the Department of Social and Rehabilitation Services (SRS). After they left the doctor's office, Rowell said that A.R. had fallen in the crib.

Rowell told Lechner that A.R. caused him a lot of trouble and that she probably was not his child. The discussion occurred ap-

proximately one month before A.R. died. On the morning of A.R.'s death, Lechner recalled that while changing a diaper she saw a hole in A.R.'s rectum. Lechner had on occasion commented to Rowell that the children had been wild. Rowell told her that he would bring something that would calm them down. Two days before A.R.'s death, Rowell brought Lechner a paddle. Lechner testified that she never reported the suspected abuse because she trusted Rowell. Lechner denied hurting A.R.

Deputy Bayless interviewed Rowell on December 20, 1991. Rowell said that A.R. had been hospitalized from December 10 to December 15 and that she had stayed with his mother from December 15 through December 18. On December 18, Rowell went to his mother's house and picked A.R. up to take her to a Christmas party later that evening. According to Rowell, A.R. seemed fine at the time. Rowell took his father home, and then Rowell and his daughters went home to have supper. He said A.R. had eaten something for dinner.

Deputy Bayless asked Rowell what he thought had happened to A.R. and informed Rowell that the child had died because of a severe blow to the stomach. Rowell responded that he did not know how that had happened. He said that he could recall one occasion approximately two or three weeks before A.R.'s death when one of the two older children had tripped and fallen onto A.R.'s stomach.

When questioned about the Christmas party, Rowell said they arrived around 8:00 p.m. and left around 10:00 p.m. and that the interaction was normal. Rowell said that no one was at home with him that evening other than his three daughters. When he awoke at 4:30 a.m., A.R. was already awake and playing in her playpen. Rowell denied having disciplined his children that morning. Deputy Bayless again questioned Rowell concerning the cause of A.R.'s injuries. Rowell repeated that he had no explanation. Rowell admitted that on occasion, for discipline, he had swatted his girls on their bottoms with the open part of his hand. Deputy Bayless later learned that K.R. and T.R. mentioned Rowell had used a wooden paddle for discipline.

Bayless interviewed K.R., age five. She informed him that Rowell, not Lechner, had spanked A.R. on December 19. According

to K.R., Rowell used a fly swatter, a belt, and a wooden paddle. In a later interview, K.R. said that Rowell had punched a hole in the wall at their home when A.R. was screaming. Bayless also interviewed Rowell's mother, Peggy, who stated, among other things, that she doubted her son was A.R.'s father and that A.R. had eaten on December 18, 1991, and seemed to have been feeling fine.

A KBI agent interviewed Rowell. When Rowell was asked how A.R. died, he told the agent that her death was due to natural causes. Rowell said that he had put the hole through the wall because his ex-wife had upset him. He admitted to a temper but said that it had been under control since the children were born. He also admitted that he occasionally spanked his children a little hard.

Dr. Audrey Roberts, a pediatrician, assisted Dr. Jantz in treating A.R. Dr. Roberts had received special training in child sexual abuse. She reviewed Dr. Scamman's pathology report and said that she had seen similar injuries on three occasions, two were abuse cases and one involved a child who had been watching western movies. The child decided to imitate his favorite cowboy by jumping off the barn roof and attempting to land on a haystack but instead landed across his abdomen on a sawhorse. She testified that a forceful blow caused A.R.'s injuries and not an accident such as falling on the floor. Dr. Roberts said that the vaginal tears were not consistent with a crib straddle injury, but were consistent with penetration by something larger than a child's fingers. Dr. Roberts further testified that A.R.'s skull fracture was consistent with a hard object being swung at the base of the skull or with throwing the child very hard against a wall or table. In Dr. Roberts' opinion, A.R. suffered from battered child syndrome.

Donald Rowell, Sr., the defendant's father, testified that when he went with his son to pick A.R. up from Peggy, on December 18 the child was laughing and playing and appeared to feel good. He also said that once his son had discussed A.R.'s vaginal bleeding, informing him that a doctor had said it was nothing to worry about and that it was just something passing through her system.

Cindy Lewis testified that when Rowell and his children attended the Christmas party at her house on December 18, 1991,

A.R. had been smiling and laughing. No one had hit or disciplined the child. Christine Beasley said that she was present at the party. She described A.R. as playing with toys and being happy. While at the party, A.R. ate some crackers.

### Rowell's Ability to Present His Defense

The State requested an order in limine

"prohibiting or restricting the defense from presenting or referring to the character of Angela Lechner or nature and content of reports of specific instances of conduct of Angela Lechner to SRS and the investigation and findings resulting from such reports, or cross-examining Angela Lechner concerning the above referenced evidence and testimony."

Rowell's attorney wanted to cross-examine Lechner concerning:

(1) Possible suicidal ideation, which led her out of concern for herself and her children to seek treatment at Prairie View, Inc., in August of 1991;

(2) Report by Lechner's Prairie View psychiatrist to SRS of potential for abuse or neglect; and

(3) Two prior instances, remote in time and out of state, where her ex-husband was reported to have abused two of her own children.

The trial court granted the State's motion in limine as to the cross-examination of Lechner.

Rowell claims prejudice to his case in not allowing the jury to hear that in August of 1991 Lechner was under such stress that she either was going to commit suicide or hurt her own children. He contends that the SRS evidence should have been admitted to show that another person, Lechner, committed the crime. Lechner was a suspect based on A.R.'s time of death and Dr. Scamman's testimony, he asserts. Thus, he argues the court's order in limine choked off a valid defense.

### Discussion

We apply the abuse of discretion standard of review to the motion in limine issue. The admission or exclusion of evidence is within the sound discretion of the trial court. *State v. Coleman*, 253 Kan. 335, 344, 856 P.2d 121 (1993).

Rowell was not denied the opportunity to present his theory of defense. Rowell's counsel on cross-examination asked Lechner questions that elicited testimony about how long she had been babysitting and how the children were treated. Rowell's counsel also asked whether any children, including Lechner's own, had ever suffered injuries that put them in the hospital while in her care. Defense counsel asked Lechner why she had not reported A.R.'s suspicious physical symptoms. His last question on recross-examination was, " 'Ms. Lechner, did you ever hurt [A.R.]?' " The babysitter's contemplation of suicide or fear of taking her stress out on her children occurred in August of 1991. Lechner did not begin babysitting for Rowell until September 1991. The court did allow Rowell to call a witness to say that the SRS had received a concern about Lechner, that a report was taken, and that it passed through channels.

We observed in *State v. Massey*, 242 Kan. 252, 265, 747 P.2d 802 (1987), that a motion in limine should be granted only when the trial court finds two factors are present: (1) The material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer of or statements made during trial concerning the material will tend to prejudice the jury.

The relevance of the evidence that Rowell believes should have been admitted is questionable. The reports that Lechner's ex-husband had been the subject of child abuse charges are irrelevant. The conduct of Lechner's ex-husband does not in any way serve as proof of Lechner's conduct, motive, or intent. There is no logical connection between the reports concerning the ex-husband, who was not living with Lechner when she was babysitting for Rowell, and the inference that Lechner committed the crime.

The evidence concerning Lechner's self-report of fears regarding her mental state is a closer question. We stated in *State v. Bradley*, 223 Kan. 710, 714, 576 P.2d 647 (1978): " 'It is fundamental to a fair trial to allow the accused to present his version of the events so that the jury may properly weigh the evidence and reach its verdict. The right to present one's theory of defense is absolute.' " The Sixth Amendment to the United States Constitution guarantees the right to confront witnesses. A defendant

has a right to "meet the witness face to face." Kansas Const. Bill of Rights, § 10.

The determination of the relevance of Lechner's fears and the related SRS report is a trial court judgment call. As such, exclusion involves trial court discretion. The evidence of what occurred in August 1991 before the time when Lechner began watching the Rowell children does not provide proof that directly implicates Lechner.

"[E]vidence of traits of a witness's character other than honesty or veracity or their opposites, as well as evidence of specific instances of conduct relevant only to prove such traits of character, are inadmissible as affecting credibility. See K.S.A. 60-422(c) and (d)." *State v. Davis*, 237 Kan. 155, 160, 697 P.2d 1321 (1985). See *State v. Lewis*, 252 Kan. 535, 536-37, 847 P.2d 690 (1993). The Court of Appeals, however, has suggested that "[u]nder certain circumstances, the evidentiary restraints of K.S.A. 60-422(d) must yield to a defendant's constitutional right of cross-examination." *State v. Barber*, 13 Kan. App. 2d 224, Syl. ¶ 2, 766 P.2d 1288, *rev. denied* 244 Kan. 739 (1989). We have determined that despite a right to present a defense claim, the admission of the desired evidence still "is subject to statutory rules and case law interpretation of rules of evidence and procedure." *State v. Thomas*, 252 Kan. 564, 573, 847 P.2d 1219 (1993). We held in *State v. Potts*, 205 Kan. 42, Syl. ¶ 1, 468 P.2d 74 (1970): "When the state relies on direct rather than circumstantial evidence for conviction, evidence offered by defendant to indicate a possible motive of someone other than the defendant to commit the crime is irrelevant absent other evidence to connect such third party with the crime."

The case at bar is a circumstantial evidence case. Rowell was able to have the fact of the report to the SRS admitted into evidence. Additionally, there was evidence of the events occurring while A.R. was in Lechner's exclusive care. We find no abuse of discretion in granting the motion in limine.

Rowell advances K.S.A. 60-455 as a basis for admitting the evidence at issue. K.S.A. 60-455 relates to the admission of evidence that a person committed other crimes or civil wrongs. Lechner

committed no crime or civil wrong. K.S.A. 60-455 is not applicable. Lechner's self-reporting constituted mature, responsible behavior that is to be encouraged.

### Rowell's Right to Testify on His Own Behalf

Rowell asserts that he was denied the right to testify in his own behalf. The following exchange occurred between Rowell and his new counsel at the hearing on his motion for a new trial:

"Q. While the trial was going on did you—at the first part of the trial did you talk to Michael Dunn [Rowell's retained trial counsel] about whether or not you should testify?
"A. Yes, the first week I did.
"Q. Okay. And what did you tell him?
"A. We talked about testifying, I told him I wanted to testify, and we would talk about it later on.
"Q. Okay. So, what you said was, if I'm clear, you said that you wanted to testify?
"A. Yes, I did."

. . . .

"A. I told him I wanted to testify.
"Q. Okay. Did he ever—Were you ever allowed to testify?
"A. No.

. . . .

"Q. . . . . After the State rested did you—did you ever have a conversation with Mr. Dunn about testifying?
"A. No.
"Q. Did the Court ever ask you if you waived your right to testify?
"A. No.
"Q. Did you ever tell anyone that you did not want to testify?
"A. No.
"Q. Did you want to testify in this case?
"A. Yes, I did."

Rowell contends that the fact that he testified without an attorney in front of the grand jury before the indictment was issued and spoke with the police twice support the conclusion that he would have wanted to testify at trial.

Dunn also testified at the hearing on the motion for a new trial and gave a sharply different account of the facts. Dunn said that he consulted many times with Rowell about whether Rowell should testify at trial. Dunn explained that Rowell "vacillated" back and forth as to his desire to testify. Dunn said he provided

Rowell with the transcript of Rowell's grand jury testimony, which he believed was, at times, damaging. Dunn testified that his approach is to present the law and facts necessary for his client to make an informed decision and then let the client decide whether to testify. Dunn further said that after presenting the last defense witness, he turned to Rowell and asked him whether he wanted to testify. Rowell replied, "No." Dunn said that, based on the evidence and Rowell's prior reaction in front of the grand jury, he recommended to Rowell that he not testify but left the ultimate decision with his client. Dunn requested the jury instruction regarding a defendant not testifying because Rowell said he would not be taking the stand.

## Discussion

Except for Rowell's testimony, the evidence presented at the hearing on the motion for a new trial shows that Dunn did not prevent him from testifying. Rowell never informed the court or anyone else before the motion for a new trial that he was dissatisfied with Dunn's representation. Rowell admitted that Dunn (1) filed and argued defense motions; (2) cross-examined the State's witnesses; (3) called witnesses on Rowell's behalf; (4) held conferences with Rowell and his family before and during the trial; and (5) made both an opening statement and a closing argument on Rowell's behalf.

At the jury instruction conference, the judge, counsel, and Rowell went over the proposed instructions. Rowell did not question the instruction concerning the fact that he did not testify.

In *Taylor v. State*, 252 Kan. 98, Syl. ¶ 5, 843 P.2d 682 (1992), we held:

"A trial court has no duty sua sponte to address a silent defendant and inquire whether he or she knowingly and intelligently waives the right to testify. An express waiver, on the record, is not necessary because a defendant's conduct provides a sufficient basis from which to infer that the right to testify is waived. There is a danger that by asking a defendant if he or she is aware of his right to testify, a trial court may inadvertently influence a defendant to waive the equally fundamental right against self-incrimination."

The fact that Rowell had given statements to law enforcement officers and had testified in front of a grand jury does not mean

that Rowell wanted to take the witness stand at trial. Dunn testified that one factor regarding the wisdom of Rowell's testifying considered by the defense was that Rowell lost his temper during the grand jury proceedings.

Rowell has the burden to satisfy the requirements of the ineffective assistance of counsel test. See *Chamberlain v. State*, 236 Kan. 650, 655, 694 P.2d 468 (1985). Additionally, in evaluating an ineffective assistance of counsel claim, "[t]he appellate court places much deference upon the findings of the trial judge who saw all the proceedings first-hand as they happened. [Citation omitted.]" *State v. Humphrey*, 252 Kan. 6, 25, 845 P.2d 592 (1992). "It is the duty of the trial court to weigh the evidence presented and to pass on the credibility of the witnesses." *Taylor v. State*, 252 Kan. at 104. Rowell must " 'overcome a presumption counsel's assistance was reasonable.' [*Chamberlain v. State*,] 236 Kan. at 654." *State v. Tucker*, 253 Kan. 38, 45, 853 P.2d 17 (1993).

Significant evidence supported the trial court's determination that Rowell was given the opportunity to testify. "Upon appellate review, the appellate court accepts as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the trial judge." *Taylor*, 252 Kan. 98, Syl. ¶ 3. The record shows that the trial court carefully considered the testimony regarding Rowell's opportunity to testify. We find no abuse of discretion in denying Rowell's motion for a new trial.

## Sufficiency of the Evidence

Rowell takes the position that there was insufficient evidence to support the finding that he was guilty of first-degree murder and rape. He emphasizes that the case at bar was based entirely on circumstantial evidence and that this evidence showed that at least two different individuals, himself or Lechner, could have committed the crime.

"The standard of review on sufficiency of the evidence is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found defendant guilty beyond a reasonable doubt." *State v. Bradford*, 254 Kan. 133, Syl. ¶ 3, 864

P.2d 680 (1993). Furthermore, "[a] conviction of even the gravest offense may be sustained by circumstantial evidence." *Bradford*, 254 Kan. 133, Syl. ¶ 2. "When considering the sufficiency of circumstantial evidence to sustain a conviction of a crime the question on appeal is not whether the evidence is incompatible with any reasonable hypothesis except guilt. That question was for the jury and the trial court." *State v. Clemons*, 251 Kan. 473, 488, 836 P.2d 1147 (1992).

The evidence, when viewed in the light most favorable to the prosecution, supports the conviction. The evidence shows that A.R. had been subjected to abuse for a long time. A.R.'s mother first noticed bruises on her child's body in April or May of 1991, long before Lechner began caring for the children. There was evidence that the abdominal injuries A.R. suffered were probably caused by a man. Testimony concerning the period during which A.R. received the blow to the abdomen coincides with the time when A.R. was in Rowell's care. In addition, Rowell made evasive and suspicious statements regarding A.R.'s injuries on more than one occasion.

## Rape and Aggravated Incest

Rowell asserts that because A.R. was his daughter, he should have been charged under K.S.A. 21-3603 with aggravated incest rather than rape. According to Rowell, the charging error requires that he be found not guilty of rape. The issue is controlled by *Carmichael v. State*, 255 Kan. 10, 872 P.2d 240 (1994). Although in *Carmichael* the review was upon a K.S.A. 60-1507 motion and the review in Rowell's case is upon a direct appeal, both challenge the State's failure to charge the specific offense of aggravated incest. The result in both situations is the imposition of an erroneous sentence. We have jurisdiction to vacate any judgment of a district court to assure that the judgment is just, legal, and free of abuse. K.S.A. 1993 Supp. 60-2101(b). We have specific statutory jurisdiction to correct an illegal sentence at any time. K.S.A. 22-3504. See *State v. Scherzer*, 254 Kan. 926, 929-30, 869 P.2d 729 (1994). We vacate the sentence of rape and remand for resentencing for aggravated incest.

Affirmed in part, vacated in part, and remanded for resentencing for aggravated incest.