No. 71,398

STATE OF KANSAS, *Appellee*, v. HAROLD H. HILL, *Appellant.*

(895 P.2d 1238)

Opinion filed June 2, 1995.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Charles R. Reimer*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Harold H. Hill appeals from his jury trial convictions of aggravated kidnapping (K.S.A. 21-3421); two counts of aggravated robbery (K.S.A. 21-3427); three counts of rape (K.S.A. 21-3502); three counts of theft (K.S.A. 21-3701[a]); and four counts of aggravated burglary (K.S.A. 1992 Supp. 21-3716).

The convictions herein arise from four incidents occurring in the College Hill area of Wichita in July and August of 1992. These are summarized as follows:

## July 16, 1992

S.W. lived alone in her apartment. Around 4:30 a.m. she was awakened by a man sitting on her. He held a knife to her throat. She was gagged and then raped. S.W.'s attacker took her purse, some videotapes, and around $200 in cash. Her telephone cord had been cut.

## July 21, 1992

Kristin Pelowski, Sonja Tucker, and Lisa Fiers rented a house. Each had her own bedroom. The door to Kristin's bedroom sticks and is hard to open and close. During the early morning hours of July 21, 1992, Kristin was awakened by her door "popping" open. She asked who was there, but received no answer. She then heard footsteps descending the stairs. Assuming one of her roommates was the source of the noises, Kristin went back to sleep.

The next morning Kristin discovered the front door was open and that a pane of glass had been removed from the back door. The telephone cord had been cut. Missing from the residence were a camera, painkiller medication, a VCR, some videotapes, an extra set of house and car keys which were on a wooden key chain with

"Sonja" inscribed thereon, and Sonja's purse which had contained $30-$40. A fingerprint was taken from the removed glass pane. The print was later matched to that of defendant's left thumb.

## August 24, 1992

During the early morning hours of August 24, 1992, C.B., who lived alone in her apartment, was awakened by a man leaning over her bed. The man held a gun on her. He told her if she would be quiet she would not be hurt. The man tied C.B.'s hands behind her back with loop-knotted twine and raped her. The man dumped the contents of C.B.'s purse on the floor and again raped C.B. C.B. complained that he was hurting her and offered to masturbate her attacker. The man then freed her hands. C.B. felt bumps on the underside of her attacker's penis. The man then raped C.B. again. His gun was against C.B.'s head. She touched the gun and pulled the trigger. C.B. testified it sounded like a toy gun or cap pistol. This angered her attacker, who beat C.B.'s face until she stopped struggling. He then tied C.B.'s hands and ankles and gagged her.

Later, when C.B. had freed herself, she discovered her TV, VCR, stereo and speakers, videotapes, and the contents of her purse, including her wallet, were missing.

## August 29, 1992

During the early morning hours of August 29, 1992, Nancy Fesler was asleep on the living room couch of her apartment. She awakened to see a man about 3-4 feet away. He had moved her stereo equipment and telephones into the middle of the room, with their cords wrapped for transport. The man went into the kitchen. Nancy checked her purse and found her house and car keys were missing. She went upstairs and dialed 911.

The first police car arrived in time for the officer to see Nancy's automobile leaving her driveway. The officer gave chase. Nancy's automobile was abandoned after it hit a parked Jeep. A search of the area disclosed defendant hiding behind a bush. On his person were a pocket knife, a steak knife (identified as Nancy's), Nancy's television remote control, a toy gun, lengths of slip-knotted twine, and $132 in cash. In Nancy's vehicle were her stereo equipment

and telephones. Nancy later discovered $160 in cash had been taken.

Defendant's residence was searched. Found in the residence were S.W.'s purse and checkbook, Sonja Tucker's purse, and C.B.'s wallet and her videotapes, as well as twine identical to that found on C.B.'s bed. After arrest, bumps on defendant's penis similar to those described by C.B. were observed. An information was filed charging defendant with the 11 felonies and 2 misdemeanors herein. Additional facts will be set forth for the discussion of particular issues.

## SPEEDY TRIAL

For his first issue, defendant contends his statutory and constitutional rights to a speedy trial have been violated. We do not agree.

We shall first consider the statutory claim. K.S.A. 22-3402(1) provides:

"If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (3)."

Defendant was arraigned on October 26, 1992. His trial commenced on June 14, 1993. Defendant's motion for dismissal under K.S.A. 22-3402(1) was denied on two grounds: (1) a crucial trial continuance was granted by agreement; and (2) defendant was not held in jail solely on the charges herein.

What time should be charged to whom is hotly disputed herein. We find it unnecessary to determine the propriety of the district court's ruling in that regard and turn instead to the alternative ground found by the district court, namely that the statute did not apply as the defendant was not being held in jail solely on the charges herein.

Evelyn DeLoche testified that defendant was released from prison on March 20, 1991, and that she had been assigned as his parole officer. Defendant was arrested on the charges herein on

August 29, 1992. On August 31, 1992, she placed a state arrest and detain order against defendant for failure to report his arrest as required by the terms of his parole. Ms. DeLoche further testified that defendant was to be held in jail under the order until his appearance before the Parole Board. She further testified that her order would have stayed in effect even if the State had dismissed the charges herein.

Unless a defendant is being held in jail solely on the charges in the case, the 90-day time limit set forth in K.S.A. 22-3402 does not apply. *State v. Goss*, 245 Kan. 189, Syl. ¶ 1, 777 P.2d 781 (1989). There was substantial competent evidence supporting the district court's determination that K.S.A. 22-3402 was inapplicable because the defendant was not being held in jail solely on the charges herein. We find no error or abuse of discretion in the district court's determination thereof.

Next, defendant argues his right to a speedy trial under the Sixth Amendment to the United States Constitution has been violated.

The leading United States Supreme Court case on the right to speedy trial is *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972). In *Barker*, more than five years elapsed between defendant's arrest and trial. The United States Supreme Court adopted a case-by-case flexible approach for determining whether an accused's constitutional right to a speedy trial had been violated, stating:

"A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." 407 U.S. at 530.

Less than five months after *Barker*, we adopted the *Barker* four-point analysis in *State v. Otero*, 210 Kan. 530, 502 P.2d 763 (1972). In *Otero* there was more than an eight-year delay between charges

being filed and trial. The court found this delay violated defendant's right to a speedy trial and reversed his conviction.

In *State v. Goss*, 245 Kan. at 193, we held: "The length of delay herein—a little over a year between arrest and trial—is not clearly presumptively prejudicial as enunciated by *Barker v. Wingo*, and hence there is no necessity for inquiry into the other factors that go into the balancing test."

In the case before us, less than 11 months elapsed between defendant's arrest and trial. As in *Goss*, there is no necessity for inquiry into the other factors that go into the balancing test. There is no error or abuse of discretion in the district court's determination that defendant's constitutional speedy trial rights had not been violated.

## SEVERANCE

For his second issue, defendant contends the district court's denial of his motion for separate trials of the charges arising from each of the four incidents constitutes an abuse of judicial discretion.

K.S.A. 22-3202(1) provides:

"Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

On June 4, 1993, 10 days before trial was scheduled to begin, defendant filed a motion to sever the charges against him and try them in four separate proceedings. Defendant argued that the four incidents were unrelated to each other, were not of the same or similar character, were not based on the same act, and were not part of any common scheme or plan, and that the cumulative effect of the evidence would be prejudicial to him and prevent him from receiving a fair trial. On June 6, 1993, a hearing was held on the motion. The trial court denied the motion, holding that the counts were all of the same or similar character and they constituted part

of a common scheme or plan. The request for separate trials was renewed at trial and, again, denied.

Whether a defendant will be tried on all separate charges in a single trial is a matter within the discretion of the trial court, and its decision will not be disturbed on appeal unless there is a clear showing of abuse of discretion. *State v. Crawford*, 255 Kan. 47, Syl. ¶ 4, 872 P.2d 293 (1994); *State v. Cromwell*, 253 Kan. 495, Syl. ¶ 10, 856 P.2d 1299 (1993); *State v. Woods*, 250 Kan. 109, 116, 825 P.2d 514, *cert. denied* 121 L. Ed. 2d 100 (1992). If reasonable people could differ about the propriety of the trial court's decision, this court will not find that the trial court abused its discretion. *State v. Cromwell*, 253 Kan. at 511.

Even if a trial court's consolidation decision is determined to be an abuse of discretion, the defendant has the burden of showing prejudice requiring reversal. *State v. Crawford*, 255 Kan. at 54; *State v. Walker*, 244 Kan. 275, 278, 768 P.2d 290 (1989). See *State v. Thomas*, 206 Kan. 603, 481 P.2d 964 (1971).

The district court held that the four incidents were of the same or similar character and that they constituted parts of a common scheme or plan. There were many similarities. The four incidents occurred in the same neighborhood within a rather short time span. The residences involved were occupied by women only. The attacker in the two incidents involving rape was similarly garbed. The attacker gagged each woman. Before leaving he made each woman roll over on her stomach and placed a pillow on her head. In the two incidents involving rape, the victims awakened with the attacker on top of or leaning over the would-be victim. In the other two incidents, the woman awoke while the intruder was some distance away, which may have altered the intruder's plans. Similar items were taken from each residence. The pre-prepared slip-knotted twine also indicated a common plan.

None of the victims herein could identify defendant as their assailant. Identity was the primary issue in the trial. When defendant was arrested after abandoning his last victim's automobile, he had items on his person taken in the last incident. A search of his residence pursuant to a warrant revealed property taken in each of the other three incidents. Had the four incidents been tried sep-

arately, a strong argument could have been made by the State that evidence of all crimes should be admissible in all four trials under K.S.A. 60-455 to show identity.

We have declined to find error when a trial court refused to sever charges that were sufficiently similar such that evidence of one would be admissible under 60-455 in the trial of the other and no prejudice would result to the defendant. *State v. Cromwell*, 253 Kan. at 512.

Instruction No. 24 provides:

"Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged."

Thus, the jury was instructed each charge had to be considered separately.

We conclude no abuse of discretion has been shown in the district court's denial of defendant's motion to sever the charges into four separate trials.

## DNA EVIDENCE

For his third issue, defendant contends he was denied a fair trial by virtue of the admission of DNA evidence. He argues: (1) the requirements of the *Frye* standard were not met, and (2) the evidence was not relevant or material.

The objected-to evidence was the testimony of Dr. Edward Blake, a forensic serologist of Forensic Science Associates in California. Dr. Blake testified that, based upon DNA testing of vaginal swabs taken from C.B., defendant was in the 7% of the male population which could not be excluded as the donor of the semen found therein. The DNA test performed was polymerase chain reaction (PCR) amplification. This is the first time the question of the admissibility of PCR testing has been before us. The other most commonly utilized DNA testing used forensically is restriction fragment length polymorphism (RFLP) analysis.

In *Smith v. Deppish*, 248 Kan. 217, 807 P.2d 144 (1991), the admissibility of RFLP analysis was before us in a case of first impression. The *Frye* test was applied thereto. We held, *inter alia*:

"DNA print testing and the process of Restriction Fragment Link Polymorphism analysis have been recognized as reliable, have gained general acceptance in the scientific community, involve scientifically and professionally established techniques, and, thus, meet the criteria for admissibility under the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)."

"While DNA print testing and the process of Restriction Fragment Link Polymorphism Analysis meet the standard of general acceptance in the scientific community and thus are admissible on that basis, such test results may be inadmissible on grounds of relevancy or prejudice as well as under traditional challenges to admissibility of evidence such as contamination of the sample or chain of custody questions." 248 Kan. 217, ¶¶ 6, 7.

The mind-boggling technology involved in RFLP analysis is highly summarized in *Deppish*. Under optimum conditions, this technology has the capability of literally matching a DNA sample to its donor. Although more definitive in its results, RFLP analysis has major drawbacks and limitations. Only a few facilities are capable of proper performance of the testing procedures, which are expensive and time-consuming. Additionally, a substantial amount of the material to be tested is required, and the same must be in good condition.

The newer PCR amplification procedure is less definitive as it can only exclude an individual as being a possible donor of the sample. Thus, the final result is that the tested individual is not the sample donor or the individual is within a certain percentage of the population which could have donated the sample. The advantages of PCR as opposed to RFLP are that it is faster, cheaper, and capable of being performed at more facilities. Additionally, it can test samples too small and/or in too poor a condition to be tested by RFLP analysis.

Little would be gained by an extensive discussion of the scientific concepts involved in PCR amplification. It is sufficient to state that the procedure can cause replification of a targeted section of DNA into a sufficient quantity to be readily analyzed. In *State v. Russell*, 125 Wash. 2d 24, 882 P.2d 747 (1994), the process was described as follows:

"One microbiologist has described PCR as a genetic photocopy machine. Kamrin T. MacKnight, Comment, *The Polymerase Chain Reaction (PCR): The Second Generation of DNA Analysis Methods Takes the Stand*, 9 Santa Clara Computer

& High Tech. L.J. 287, 304 (1993). The PCR amplification system takes advantage of the natural DNA replication system and manipulates it to the advantage of the analyst to produce many millions of DNA copies. MacKnight, at 304.

" 'In the PCR procedure, DNA is extracted from a sample, purified, and added to a buffer solution containing chemical primers and an enzyme called 'Taq polymerase.' MacKnight, at 305. The solution is then placed in a heating device called a thermal cycler which cycles it through several successive temperature plateaus. After 30 or 40 of these cycles, the DNA has become denatured and the primers have annealed to it, identifying a 'gene of interest' which will have been replicated or amplified by the enzyme billions of times. Fleming, at 323. In a procedure called the reverse dot-blot process, the amplified DNA is flooded over a nylon membrane onto which have been dotted a number of 'allele-specific' probes, each designed to recognize one variant of the 'gene of interest.' Fleming, at 323. This may result in a color reaction and a visible dot on the membrane wherever a probe has identified one of the alleles. To determine whether two samples could have come from the same person, the analyst checks whether they have produced the same pattern of dots. If one sample produces a dot in response to a probe to which the other did not react, the samples could not have a common source. Fleming at 323.' " 125 Wash. 2d at 38-39.

In *Russell*, Washington accepted PCR testing.

Defendant contends the trial court erred in concluding that PCR amplification satisfied the principles enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Kansas has repeatedly applied *Frye*. As we stated in *Smith v. Deppish*, 248 Kan. at 236:

"The *Frye* test requires that, before expert scientific opinion may be received in evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. If a new scientific technique's validity has not been generally accepted as reliable or is only regarded as an experimental technique, then expert testimony based on its results should not be admitted into evidence. *State v. Washington*, 229 Kan. 47, Syl. ¶ 1, 622 P.2d 986 (1981).

"The use of the *Frye* test to determine the admissibility of a lie detector examination was considered by this court in *State v. Lowry*, 163 Kan. 622, 629, 185 P.2d 147 (1947). We also applied the *Frye* test to determine the admissibility of the Multi-System method of blood analysis of polymorphic enzymes in *State v. Washington*, 229 Kan. 47, Syl. ¶ 2. Whether the battered woman syndrome had sustained sufficient scientific acceptance to warrant admissibility under the *Frye* test has been discussed. See *State v. Hodges*, 239 Kan. 63, 71, 716 P.2d 563 (1986)."

Other states have likewise allowed admission of PCR DNA test results. *Harrison v. State*, 644 N.E.2d 1243 (Ind. 1995); *State v.*

*Moore*, 885 P.2d 457 (Mont. 1994); *State v. Williams*, 252 N.J. Super. 369, 599 A.2d 960 (1991); *People v. Palumbo*, 162 Misc. 2d 650, 618 N.Y.S.2d 197 (1994); *State v. Lyons*, 124 Or. App. 598, 863 P.2d 1303 (1993), *rev. allowed* 319 Or. 406 (1994); *Clarke v. State*, 813 S.W.2d 654 (Tex. App. 1991), *aff'd* 839 S.W.2d 92 (Tex. Crim. 1992), *cert denied* 507 U.S. 996 (1993); *Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609, *cert. denied* 498 U.S. 908 (1990). Although the court in *Lyons* did not decide admission under the *Frye* test, general acceptance of the procedure is an element of the evidentiary test. *State v. Lyons*, 124 Or. App. at 606. The courts in *Clarke* and *Spencer* did not use the *Frye* standard, but, based on expert testimony, both courts found that the PCR tests were sufficiently reliable to be submitted to the jury. *Clarke v. State*, 813 S.W.2d at 655; *Spencer v. Commonwealth*, 240 Va. at 98.

The only evidence as to PCR testing and its reliability and acceptance came from the State's expert, Dr. Edward Blake. Blake has impressive credentials and would appear to be one of the leaders in his field. Blake's status was demonstrated in *State v. Williams*, 252 N.J. Super. 369, as follows:

"The State offered an array of experts in molecular biology and genetics with unimpeachable credentials. All had authored and published countless articles about the PCR technique. They all opined that the PCR technique has gained the general acceptance of scientists in the particular field in which it belongs.

"The range of expert testimony offered by the State included Dr. Henry A. Erlich, Director of the Human Genetics Department at Cetus Corporation, Dr. Haig H. Kazazian, Director of the Center for Medical Genetics at John Hopkins University, School of Medicine, Dr. Dennis R. Pontani, a research scientist with the New Jersey Department of Health, who specializes in biology, Dr. David H. Bing, Scientific Director of the Center for Blood Research Laboratories, which is affiliated with Harvard Medical School in Boston, and Dr. Henry C. Lee, forensic scientist and Director of the Connecticut State Police Forensic Science Laboratory. The test itself was conducted by Dr. Edward T. Blake, a forensic serologist at the Forensic Science Associates Laboratory in California, who has conducted thousands of forensic examinations and testified as an expert hundreds of times in state and federal courts in over one-half the states, including about 20 to 25 times an expert witness on DNA, PCR and DQ alpha techniques.

"These highly qualified scientists testified to the overwhelming acceptance within the scientific community of PCR-amplified DNA testing. Each was fully familiar with the scientific requisites and proper protocol needed to obtain reliable

results and, after reviewing Blake's protocol, bench notes and result in the instant case, found his experimental design to be excellent and his results highly reliable. Indeed, every caution derived from the experience of molecular biologists and forensic scientists was included in the testing method performed by Blake. All agreed that Blake's procedure in typing the forensic sample prior to receipt of the reference samples, dividing and saving half of the forensic sample so that the defense could produce its own test results, running more than one test on the forensic sample for comparison purposes, and in simultaneously typing both positive and negative controls, does provide scientifically accurate and reliable results.

"The literature authored and published by those individuals is imposing. For instance, the number of articles which each witness has either written or played a role in publishing are as follows: Dr. Henry A. Erlich, over 100; Dr. Haig H. Kazazian, over 200; Dr. Dennis R. Pontani, over 12; Dr. David H. Bing, over 50; Dr. Henry C. Lee, over 150; and Dr. Edward T. Blake, over 75. Many of their recent articles deal with the reliability of PCR testing techniques.

"In addition, it was shown that there are at least two dozen courts that have ruled favorably upon the reliability of PCR tests.

"Against this imposing array of evidence and testimony from the leading molecular biologists and geneticists in the nation, defendant did not offer a single witness in opposition.

. . . .

"[I]n the face of such overwhelming and persuasive testimony and evidence, this court concludes that the State has clearly and convincingly proven that the PCR testing has gained general acceptance in the particular field in which it belongs and, accordingly, testimony of this testing technique is admissible." 252 N.J. Super at 380-83.

In the case before us, Dr. Blake testified that the PCR amplification was reliable and accepted by the scientific community. No evidence was presented disputing Blake's opinion. We find no error or abuse of discretion in the trial court's determination that the State had satisfied the *Frye* test relative to the admission of PCR amplification evidence herein. There is no claim the testing was improperly performed.

Finally, defendant argues admission of the test results was irrelevant and immaterial. This point arises from Dr. Blake's testimony on cross-examination that it was possible that some of C.B.'s DNA had not been removed from the tested sample, which could alter the results. Such would be due to the very small size of the sample. This goes to the weight to be afforded the witness' testi-

mony that defendant was within the 7% of the population that could not be excluded as the donor of the sample.

Additionally, it should be noted that the State's case against defendant on the C.B. crimes did not stand or fall on the DNA testing. Some of the other evidence included various items of property taken from C.B. were found in defendant's bathroom. Also, C.B.'s description of her assailant, including bumps on his penis, and clothing were consistent with the defendant.

We find no error or abuse of discretion in the admission of Dr. Blake's testimony relative to the DNA testing herein.

## SUFFICIENCY OF THE EVIDENCE

For his fourth issue, defendant challenges the sufficiency of the evidence supporting his conviction on all charges except those arising from the last incident involving Nancy Fesler.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Halloway*, 256 Kan. 449, Syl. ¶ 1, 886 P.2d 831 (1994); *State v. Rowell*, 256 Kan. 200, Syl. ¶ 4, 883 P.2d 1184 (1994); *State v. Hays*, 256 Kan. 48, Syl. ¶ 5, 883 P.2d 1093 (1994).

In this issue, defendant does not contend that the State failed to prove that some or all of the crimes did not occur. Rather, defendant contends the evidence was insufficient to prove that he was the perpetrator.

With this in mind, the evidence may be summarized as follows:

### S.W.

S.W.'s rapist was black and wore a wool stocking cap and dark clothing. He used a knife. He took S.W.'s purse, with her identification, and some videotapes. The defendant, a black man, had on a wool stocking cap and was carrying a knife when arrested. S.W.'s purse and identification were discovered in his home.

### C.B.

C.B. was raped by a black man who bound her with twine and

wire tied to slip knots. He used a toy gun and a knife. He wore a nylon stocking cap type head covering and camouflage pants. C.B. felt small bumps in one area on the underside of her assailant's penis. The assailant put on black heavy leather work gloves. He took C.B.'s wallet, identification, and some videotapes, in addition to other items.

The defendant was arrested wearing camouflage pants, a wool cap, and a nylon-type hair net. He was armed with a knife and had a toy gun. He was carrying lengths of twine tied in slip knots, and some wire, and he was wearing black leather gloves.

A search of the defendant's home turned up twine, found through K.B.I. analysis to have the exact same characteristics as the twine fibers left on C.B.'s bed and potentially originating from the same source. Wire was also found, as well as C.B.'s wallet, identification, and two of her videotapes. Small growths were observed on the underside of the defendant's penis. DNA PCR analysis did not exclude the defendant as the donor of sperm found in C.B.'s vagina. The analysis excluded 93% of the male population.

Defendant further contends the semen stains and a Negroid hair found on C.B.'s bedsheet and determined not to be that of the defendant was exculpatory evidence which the jury ignored. This evidence was not exculpatory; it merely was not inculpatory. C.B. stated a black male friend housesat for her when she was gone and slept in her bed prior to the rape. With regard to the semen stain, C.B. stated that prior to the rape this friend had told her he had ejaculated on the bed while housesitting. C.B. also testified she had had oral sex with someone she was dating about a week or two before the rape, and he had ejaculated on her sheets.

### Tucker, Fiers, Pelowski

The three young women were burglarized by someone who took items, including Sonja Tucker's purse and a wooden key fob with her name on it, which was found in defendant's residence. In addition, entry had been made by removing a glass pane from the back door. The defendant's fingerprint was on the pane.

We find no merit in defendant's challenge to the sufficiency of the evidence supporting his convictions as the perpetrator of the

offenses involved in this issue. We are convinced that a rational factfinder could have found defendant guilty beyond a reasonable doubt.

## AGGRAVATED BURGLARY INSTRUCTIONS

For his fifth issue, defendant contends the four aggravated burglary instructions are defective because they do not contain the elements of the underlying felonies. Defendant cites *State v. Linn*, 251 Kan. 797, 840 P.2d 1133 (1992), and *State v. Rush*, 255 Kan. 672, 877 P.2d 386 (1994), in support of his position.

In *State v. Linn*, 251 Kan. 797, defendant was convicted of first-degree felony murder, aggravated battery, and aggravated burglary. On appeal, he contended, *inter alia*, that the trial court erred in failing to specify the underlying felony intended for a conviction for aggravated burglary. The charge of aggravated burglary alleged that the defendant entered or remained in the home "with intent to commit a felony or theft therein." 251 Kan. at 799. The State argued its evidence would support theft, aggravated battery, or robbery as the underlying felony for aggravated burglary. The trial court's instruction incorporated the language of the aggravated burglary statute (K.S.A. 21-3716) and stated that to find the defendant guilty of aggravated burglary, the jury must find that the defendant entered or remained in the residence "with the intent to commit a felony or theft therein." 251 Kan. at 800. The instruction failed to specify a specific felony the defendant allegedly intended to commit inside the resident's home or specify the statutory elements of theft or any other felony.

We agreed that reversible error had occurred, reasoning:

"The question raised is whether the trial judge's failure to state the specific underlying felony and its statutory elements in his instructions to the jury deprived the defendant of a fair trial.

"Under the Constitution of the United States and the Constitution of the State of Kansas, a person accused of a crime is guaranteed the right to a fair trial. In cases tried to a jury, the judge and jury have separate and distinct functions. It is for the judge to determine and decide questions of law presented during the trial and to state the applicable law in the judge's instructions to the jury. It is for the jury to decide the facts from the evidence submitted and to render a verdict in accordance with the judge's instructions.

"An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. *State v. White*, 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990).

"An instruction as to the offense of aggravated burglary is defective unless it specifies and sets out the statutory elements of the offense intended by an accused in making the unauthorized entry.

"Under the circumstances here, the trial judge's failure to state the specific underlying felony or felonies and their elements prevented the jury from rendering a lawful verdict and was an error of constitutional magnitude depriving the defendant of a fair trial. Under the circumstances, Linn's conviction for felony murder and aggravated burglary must be set aside and the defendant granted a new trial." 251 Kan. at 802.

In *State v. Rush*, 255 Kan. 672, defendant contended the trial court instructed as one of the elements of burglary that the defendant knowingly entered the building "with intent to commit a theft therein" but failed to instruct on the elements of the crime of theft. The Court of Appeals affirmed this issue. On petition for review to this court, we reversed, reasoning:

"The Court of Appeals in its decision here attempted to distinguish our decision in *State v. Linn*, 251 Kan. 797, 840 P.2d 1133 (1992), on the basis that *Linn* presented evidence of several underlying felonies (theft, aggravated battery, or robbery), but here we have only one underlying felony, that being felony theft. *Linn's* holding was clear: 'An instruction as to the offense of aggravated burglary is defective unless its specifies and sets out the statutory elements of the offense intended by the accused in making the unauthorized entry.' 251 Kan. at 802. We find the distinction by the Court of Appeals is not supported based on the very specific holding in *Linn*. We hold, therefore, that the trial court committed reversible error in instructing the jury as to the offense of burglary because it did not 'set out the statutory elements of the offense intended by the accused' in its burglary instruction." 255 Kan. at 679.

In *State v. Watson*, 256 Kan. 396, 885 P.2d 1226 (1994), we reaffirmed the *Linn* rule. In *Watson*, defendant was convicted of attempted aggravated burglary. The Court of Appeals affirmed the conviction in an unpublished decision. On petition for review, defendant contended that the trial court's instruction on attempted aggravated burglary was incorrect because at no place in the instructions were the elements of theft included. We agreed that the trial court's failure to set out the statutory elements of theft was

erroneous, but found the error to be harmless because we had a firm belief beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. 256 Kan. at 404.

The *Linn*, *Rush*, and *Watson* cases are distinguishable.

In the four aggravated burglary charges herein, the requisite intent was stated to be that defendant entered the residences with intent to commit the following crime or crimes:

1. S.W.—rape, aggravated robbery, or theft;
2. Sonja Tucker—theft;
3. C.B.—rape, aggravated robbery, or theft;
4. Nancy Fesler—theft.

In its instructions, the trial court instructed on, in addition to the four aggravated burglaries, the following crimes:

1. S.W.—rape, aggravated robbery, and theft (as a lesser included offense);
2. Sonja Tucker—theft;
3. C.B.—rape, aggravated robbery, and theft (as a lesser included offense);
4. Nancy Fesler—theft.

Thus, the jury was not in the dark as to what felony the State had to prove defendant intended to commit in each residence or what the elements were for each such felony. The jury was fully instructed in this regard. Including the elements of each such felony in the aggravated burglary instruction would, under the circumstances herein, have been duplicitous and confusing. We find no error in this issue.

## SENTENCING

For his final issue, defendant contends that sentences imposed herein constitute an abuse of judicial discretion as the trial court gave a lengthy sentence with only brief references to the sentencing considerations and guidelines contained in K.S.A. 21-4601 and K.S.A. 21-4606.

Defendant was convicted of 11 felonies and 2 misdemeanors herein. These included: 1 class A felony, 5 class B felonies, 4 class C felonies, and 1 class E felony. The Habitual Criminal Act, K.S.A. 1992 Supp. 21-4504, was invoked. In the aggregate, defendant received a term of life plus 171 years to life.

K.S.A. 21-4601 provides the fundamental framework for the sentencing of criminals:

"This article shall be liberally construed to the end that persons convicted of crime shall be dealt with in accordance with their individual characteristics, circumstances, needs, and potentialities as revealed by case studies; that dangerous offenders shall be correctively treated in custody for long terms as needed; and that other offenders shall be dealt with by probation, suspended sentence, fine or assignment to a community correctional services program whenever such disposition appears practicable and not detrimental to the needs of public safety and the welfare of the offender, or shall be committed for at least a minimum term within the limits provided by law."

K.S.A. 21-4606 lists factors for consideration by a sentencing court:

"(1) In sentencing a person to prison, the court, having regard to the nature and circumstances of the crime and the history, character and condition of the defendant, shall fix the lowest minimum term which, in the opinion of said court, is consistent with the public safety, the needs of the defendant, and the seriousness of the defendant's crime.

"(2) The following factors, while not controlling, shall be considered by the court in fixing the minimum term of imprisonment:

(a) The defendant's history of prior criminal activity;

(b) The extent of the harm caused by the defendant's criminal conduct;

(c) Whether the defendant intended that his criminal conduct would cause or threaten serious harm;

(d) The degree of the defendant's provocation;

(e) Whether there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

(f) Whether the victim of the defendant's criminal conduct induced or facilitated its commission;

(g) Whether the defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained."

In *State v. Richard*, 252 Kan. 872, 880-81, 850 P.2d 844 (1993), we set forth the general parameters of sentencing:

"It is the sentencing judge alone who uses his or her discretion to determine the appropriate sentence or other disposition of the case. The sentencing judge determines the sentence by exercising his or her best judgment, common sense, and judicial discretion after considering all of the reports, the defendant's background, the facts of the case, the public safety, and the statutory guidelines for sentencing. *State v. McDonald*, 250 Kan. 73, 82, 824 P.2d 941 (1992).

. . . .

"The statutory factors which the judge shall take into consideration in determining the penalty to be imposed are enumerated in K.S.A. 21-4606. Where the sentence exceeds the minimum, the legislature intended that the sentencing judge place on the record a detailed statement of facts and factors the judge considered. Failure to do so does not always indicate the sentencing court abused its discretion. Each case is to be considered on its facts. See *State v. McDonald*, 250 Kan. at 82-83.

"Although the appellate courts have upheld sentences where the factors considered by the sentencing judge are not specifically enumerated, the appellate courts have repeatedly stated the better practice is for a trial judge to make a detailed record of the facts and factors considered in imposing sentence. See, *e.g., State v. Crispin*, 234 Kan. 104, 113, 671 P.2d 502 (1983). A sentencing court may be found to have substantially complied with K.S.A. 21-4606 when it incorporates into the record a presentence report which addresses the seven factors which must be considered pursuant to K.S.A. 21-4606(2). *State v. Webb*, 242 Kan. 519, Syl. ¶ 2[, 748 P.2d 875 (1988)]."

See *State v. Dotson*, 256 Kan. 406, 415, 886 P.2d 356 (1994).

K.S.A. 21-4601 sets forth the Kansas policy in sentencing a defendant. The trial court must observe this policy during sentencing. Failure to mention K.S.A. 21-4601 and the policy contained therein on the record is not error as long as, from the entire record, it becomes clear that the trial court considered the provisions of K.S.A. 21-4601. *State v. Johnson*, 255 Kan. 156, Syl. ¶ 5, 872 P.2d 247 (1994).

In sentencing the defendant herein, the trial court stated, in part:

"[A]ddressing the sentencing factors, first of all the defendant's history of prior criminal activity. In this case, the defendant does have a prior record; it's a significant one. The record shows that Mr. Hill has the previous conviction for aggravated robbery in Wichita in 1988, that would be a person felony offense; and he also has the conviction for attempted aggravated robbery, also in Wichita in 1988, that also is a person felony offense. Only those two convictions, but, of course, they are very serious matters, and they involve previous crimes against the person. The Court finds that the defendant caused extensive, massive harm by his criminal conduct in this case, and that the defendant intended that his criminal

conduct would cause or threaten that harm. The amount of harm caused to the victims in this case you really can't even elaborate on. I mean, we're talking about charges of rape, aggravated robbery, aggravated kidnapping. I'm sure the events surrounding this case will stay with the victims for as long as they live. The Court finds that, of course, the defendant was not provoked to commit these crimes in any way, and that there are no substantial grounds tending to excuse or justify the defendant's criminal conduct. The Court finds, of course, that the victims did not induce or facilitate these crimes in any manner. And the Court also finds that the defendant has not been able to financially compensate or reimburse the victims for any of these crimes, and there's very little likelihood that he'll ever be able to do so. The Court notes that there's no codefendant in this case, so there's no one else really for the Court to compare sentencing with. The Court notes that, of course, because of the very serious nature of the charges, there are no statutory presumptions for either probation or Community Corrections. . . . I think the thing that bothers me most about this case is that the defendant committed these acts within such a short time after being released from [prison] on his prior offenses. To me, that indicates that it was a mistake to release Mr. Hill on parole, and that he should never be released again.

"Having regard to the nature and circumstances of the crime, and the history, character and condition of the defendant, the lowest minimum term which, in the opinion of the Court, is consistent with the public safety, the needs of the defendant, and the seriousness of the defendant's crime is as follows. . . ."

The sentences imposed are lengthy. The crimes for which defendant was being sentenced were numerous and very serious. Contrary to defendant's assertion, it is clear that the sentencing court considered K.S.A. 21-4601 and -4606. The court was appropriately concerned over the seriousness of the many crimes herein and their commission so shortly after defendant had been released from prison on parole. The sentences are within the statutory limits. A sentence imposed within the statutory guidelines will not be disturbed on appeal if it is within the trial court's discretion and not a result of partiality, prejudice, oppression, or corrupt motive. *State v. Dotson*, 256 Kan. at 416; *State v. Arrington*, 251 Kan. 747, Syl. ¶ 6, 840 P.2d 477 (1992); *State v. Heywood*, 245 Kan. 615, 617-18, 783 P.2d 890 (1989).

We find no abuse of judicial discretion in the sentences imposed herein.

The judgment is affirmed.