**UNITED STATES of America, Appellee,**

v.

**Richard MESSINA, Defendant–Appellant.**

**No. 410, Docket 96–1789.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1997.

Decided Oct. 16, 1997.

Georgia J. Hinde, New York City, for Defendant–Appellant.

Daniel J. Fetterman, Assistant United States Attorney, New York City, for Appellee.

Before OAKES, MESKILL and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

Appellant Richard Messina appeals his conviction and 151–month sentence on a single count of extortion. We conclude that his arguments are meritless, and affirm.

## I. Background

Messina, a disbarred lawyer, was working as a business and financial consultant. One of his clients, Richard Spence, ran an operation that laundered drug money. Messina appears not to have had any knowledge of the money laundering scheme, and was never charged with involvement in it. He did, however, assist Spence in making and managing an investment in Biltmore Mortgage Company, which Spence had decided would both afford new business opportunities and serve as a good vehicle for laundering funds.

Biltmore proved to be a bad investment. Its president, James Clooney, had so mismanaged the company's escrow accounts that the company was in serious danger of losing

its operating license if state or federal regulators learned of its perilous financial condition. Working through Messina, Spence agreed to provide Clooney with large additional sums of money to replenish Biltmore's depleted escrow accounts, thereby staving off the company's collapse. In exchange, Clooney agreed not only to repay those sums but also to refund Spence's original investment. The total amount Spence hoped to receive from Clooney was $237,000.

Clooney did not, however, make the agreed-upon repayments to Spence. Messina therefore engaged in more earnest attempts to collect on the "debt" on Spence's behalf. He negotiated with Clooney for partial payment in the form of, among other things, two houses that Clooney owned, and some paintings that belonged to Clooney's girlfriend. But Clooney had also promised these same items to other disgruntled Biltmore investors, and, perhaps for that reason, did not deliver them to Messina.

As a result, Spence modified his collection tactics. He had Clooney kidnapped and held for ransom (which was eventually paid, in part in cash by Clooney's uncle, and in part by a turning over of the paintings and various houses). Over the course of the four-day period during which Clooney was held captive, Messina had numerous telephone conversations with several of the individuals involved, including Spence, Clooney's uncle, Clooney's girlfriend, one or more of the kidnappers, and Clooney himself. Clooney's uncle and girlfriend both told Messina that Clooney had been kidnapped. Messina maintained at trial, however, that at the time he had not believed that the kidnapping had actually occurred, and instead had thought that Clooney had faked his own abduction in order to get relatives to help him pay his debts.

According to Messina, the kidnapping was contemporaneous with, but independent of, Messina's lawful efforts to arrange for Clooney's repayment of the debt to Spence. The government believed, instead, that Messina both engaged in extortion and also participated in the kidnapping scheme. Messina was therefore charged with one count of extortion (the "extortion" charge) and one count of conspiracy to obtain money and property by extortion and kidnapping (the "kidnapping" charge). Following a five-week jury trial, he was convicted on the extortion charge but acquitted on the kidnapping charge.

The presentence report calculated Messina's adjusted offense level as 29. That level reflected a base offense of 18; a two-point upward adjustment for the amount of money involved ($237,000); a five-level enhancement because Clooney had seen the kidnappers with a gun; and a four-point adjustment for the abduction. The district court (Kevin Thomas Duffy, J.) imposed an additional two-level increase for obstruction of justice (perjury). Messina was in a criminal history category of II, and, as a result, his sentencing range became 121 to 151 months' imprisonment. The district court imposed the full 151 months.

Messina appeals his conviction on two grounds: that he did not receive a fair trial because the district court questioned him improperly; and that his Sixth Amendment right to counsel was violated by the district court's refusal to appoint "CJA" counsel after a conflict arose between Messina and his retained counsel over Messina's non-payment of attorney fees. Messina also appeals the imposition of the upward adjustments to his sentence. He argues that the district court erred in excluding polygraph evidence that would have shown that he did not know about the kidnapping. And he contends that the district court improperly imposed upward adjustments for obstruction of justice, for abduction, and for his knowledge of the kidnappers' use of a gun without making adequate factual findings to support those adjustments.

## II. District Court's Questioning of Messina

◼ Messina claims that, although "[f]or the vast majority of this trial, the district judge presided with an evenhanded decorum with which no one should find fault," the court on three occasions questioned Messina in ways that "evidenc[ed] a startling lack of restraint and culminat[ed] in an inquisitorial and baseless attack on [Messina's] credibility." Messina raised no objection to the

court's behavior at the time, however, so the issue before us is whether the judge's actions constituted plain error.[1]

██ The first occasion to which Messina points involves his trial testimony about contacts he had with one of the kidnappers, Anthony Persichetti. On the first day of direct examination, Messina testified that he had not met Persichetti. The next day, however, Messina admitted that he had met "Tony." The district court then questioned Messina about the apparent contradiction. In response, Messina explained that he had made a mistake about Persichetti's surname, but that the two of them had, in fact, met.

The second line of questioning that Messina challenges concerned testimony he gave about his having served as chairman of the Federal Bar Council ("Council"). At the end of Messina's re-cross examination, the district judge returned to this issue, and said that the Council did not have a chairman, but instead had a "posted chairman," which was a combination of president and chairman. He then showed Messina a listing of past Council presidents printed in the *Second Circuit Redbook* (a resource published by the Council). Messina conceded that his name was not on the list, but nonetheless maintained that he had been chairman (and not president). The court then recessed for lunch, and, since the evidence was by then closed, the jury was excused for the weekend.

After lunch, the district court asked counsel to return for a charge conference. When they did, the court informed them that it had received a fax confirming that Messina had indeed been the Council chairman during 1975–76. The court then said that it would inform the jury of its mistake. Accordingly, when the jurors returned on Monday morning, the district judge made an abject apology to them. He admitted that he was wrong about the organizational structure of the Council, stated that Messina had been its chairman, and told the jurors that his error demonstrated that judges are not infallible.

At no time did Messina raise objection to any of this. He was silent both when the district court was questioning him and when it made its correction and apology.

The third series of questions about which Messina complains dealt with Messina's earlier testimony that he had discarded some six pages of potentially incriminating handwritten notes that he had taken during the period when Clooney was being held captive. The district court asked Messina whether he had thrown away the notes on advice of counsel, and whether it is normally appropriate for a lawyer to destroy documents. Again, no objection was raised to the questioning either then, or later in the trial.

██ A trial court may ask questions for such purposes as "clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings." *United States v. Filani*, 74 F.3d 378, 386 (2d Cir.1996) (quoting *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir.1985)) (quotation marks omitted). And, it "may actively participate and give its own impressions of the evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become an advocate for one side." *Id.* at 385. This court, moreover, must review "the entire record and attempt to determine whether the conduct of the trial has been such that the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir.1995) (quoting *United States v. Guglielmini*, 384 F.2d 602, 605 (2d Cir.1967)) (quotation marks omitted).

After reviewing the transcript, we conclude that the challenged questioning did not amount to plain error.

The first series of questions was merely an attempt to clarify an ambiguity in Messina's testimony. Such questioning is permissible. *See, e.g., United States v. Leslie*, 103 F.3d 1093, 1104 (2d Cir.) (holding that the judge's

---

1. Under Rule 52, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed.R.Crim.P. 52(b). By contrast,

"[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a).

questioning of witnesses did not deprive the defendant of a fair trial where it was "even-handed" and "amounted to nothing more than an expansion and clarification of the witnesses' testimony"), *cert. denied,* —— U.S. ——, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997).

■ The second intervention by the trial judge cannot be justified as an attempt at clarification. But the judge's explanation to the jurors that he had erred with respect to Messina's position as Council chairman went a long way toward eliminating any damage to Messina's credibility that his questioning might have caused. To be sure, we have held that "[c]urative instructions to the jury, to the effect that they can decide what version to believe as sole judges of credibility, do not remove [an impression of judicial partisanship] once it is created." *Filani,* 74 F.3d at 386. The district court here did not, however, simply instruct the jurors that they should make their own decisions about Messina's credibility. Rather, the court specifically informed them that it had made a mistake, and expressly confirmed the veracity of the portion of Messina's testimony that it had originally called into doubt. Under the circumstances, we cannot say that the court's behavior amounted to reversible plain error.

■ The final incident is more troubling, but it lasted no more than a few minutes in the course of a full week of testimony by the defendant during a five-week trial. *Cf. Filani,* 74 F.3d at 378 (reversing on plain error standard where the district court engaged in persistent questioning of the defendant, challenging the defendant's credibility or the theory of the defense on 16 of the 60 pages of trial transcript where the defendant's testimony appeared). There is, moreover, nothing in the record to indicate that the district court displayed any "antipathy" toward Messina's testimony that "went beyond judicial skepticism," *Santa Maria v. Metro-North Commuter R.R.,* 81 F.3d 265, 273 (2d Cir.1996), or that the court "conveyed to the jury the impression that it held a fixed and unfavorable opinion of defendant[ ], [his] counsel, and [his] position," *Rivas v. Brattesani,* 94 F.3d 802, 807 (2d Cir.1996).

For these reasons, and taking into account the overwhelming evidence of Messina's guilt on the extortion charge and the obvious care the jury took when it decided to convict him on that count but to acquit him on the kidnapping charge, we conclude that the district court's conduct did not "affect[ ] [Messina's] substantial rights" as required by Federal Rule of Criminal Procedure 52(b), and hence, that it did not constitute plain error. *See also, e.g., United States v. Robinson,* 635 F.2d 981, 986 (2d Cir.1980) (holding in a similar case that "any prejudice to appellants from the trial judge's statements, comments, and questioning of witnesses, was minimal and rendered harmless by the overwhelming proof of the defendants' guilt." (citations omitted)).

### III. Sixth Amendment Right to Counsel

■ Messina argues that he was deprived of his Sixth Amendment right to adequate representation because of a dispute he had with trial counsel over legal fees. Messina claims that he was prejudiced by the fee dispute because his lawyer, in order to shorten the amount of time that he represented Messina without receiving a fee, refused to call three witnesses. (Counsel justified that action to the court improperly, Messina claims, by declaring the witnesses' testimony to be "collateral to [the] issues on trial.") Messina concedes that, in other respects, counsel's work at trial was "obviously capable." And, he praises counsel for achieving an acquittal on the kidnapping charge.

Approximately six weeks prior to trial, and at Messina's request, defense counsel asked the court to appoint substitute CJA counsel. The court denied the application, but said that it would permit a substitution if Messina's attorney could find a competent (non-CJA) attorney to take his place without delaying the trial. Messina himself then repeated his request for appointed counsel, explaining that he did not feel comfortable with his current attorney because of the amount of unpaid attorney time that the lawyer would need to spend in order to prepare adequately for trial. The court again refused the application.

Later, at trial, Messina's attorney informed the court that Messina disagreed with his decision not to call three defense witnesses. Counsel stated that he thought the testimony would be collateral, but that Messina believed that he was "not properly pursuing [Messina's] defense in that area." The court ruled that the evidence was collateral and would not be admitted. Following trial, Messina's lawyer renewed the motion for the appointment of substitute counsel. In doing so, he pointed once again to the disagreement over the calling of defense witnesses, and corrected an error in his earlier statement to the court about which three witnesses Messina had wanted him to call. The court at this point granted the motion and CJA counsel was appointed for the purposes of post-trial motions and sentencing.[2]

◼ In *United States v. O'Neil*, 118 F.3d 65 (2d Cir.1997), we recently held that "the existence of a fee dispute and an attorney's motion to withdraw for that reason do not without more constitute a conflict of interest." *Id.* at 72. Under that rule, moreover, the district court has no duty to conduct an inquiry into the possibility of a conflict of interest when prior to trial it is presented with the simple request for appointed counsel. *See id.*

We emphasize that, like *O'Neil*, this case is not one in which a lawyer cut corners in his representation because he was not getting paid. On the record before us, there is no evidence that Messina's lawyer failed to call witnesses crucial to the defense of his client in order to shorten preparation time, reduce the length of the trial, or save witness fees and fees for serving subpoenas. On the contrary, defense counsel engaged in extended and thorough cross-examination of witnesses, raised objections, and otherwise acted for the benefit of his client even though his doing so undoubtedly contributed to the trial lasting

five weeks, rather than three, as the government had originally predicted.

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987). In this case, a competent attorney could reasonably have concluded that the three witnesses' testimony was indeed collateral and unnecessary to the defense. Under the circumstances, and in the absence of any evidence in the record before us that counsel was motivated by self-interest rather than by a fair assessment of the good of his client, *O'Neil* does not permit us to second-guess his decision not to call the witnesses.[3]

**IV. Polygraph Evidence**

◼ In order to try to persuade the district court not to impose "related conduct" sentencing enhancements, Messina submitted polygraph evidence regarding his knowledge of the kidnapping. He offered to allow the government to choose the polygrapher and to attend the examination, but the government declined. For that reason, he himself arranged to be tested, and presented the results to the court at sentencing.[4] The relevant questions posed by the polygrapher were:

> Did you know in advance that Clooney was to be kidnapped?
>
> Were you aware that the $7,900 you picked up was ransom money?
>
> Did you have any reason to believe that anyone would kidnap Clooney?

Messina answered "no" to all three questions.

The polygrapher testified extensively at sentencing about his qualifications and the testing procedures he had used on Messina.

---

2. Messina's substitute lawyer was replaced, for purposes of this appeal, by his current CJA counsel.

3. Whether Messina would be entitled in a collateral proceeding to raise any related ineffective assistance of counsel claims for which extrinsic evidence is required is, of course, governed by our decision in *Billy-Eko v. United States*, 8 F.3d

111, 115–16 (2d Cir.1993), and is not before us today.

4. Messina also volunteered to be retested using any additional procedures or safeguards that the district court cared to impose in order to make the results more reliable. The court did not accept this offer.

He stated that his overall rate of error is between 5% and 10%, and that he had concluded that Messina had answered the three questions truthfully. He also said that he had twice sent Messina's test for evaluation at a specialized laboratory at Johns Hopkins University. According to his testimony, the lab had first reported that the test results were inconclusive, but later, upon changing its scoring system, it had determined that there was only a 6% chance that Messina had lied in responding to the three questions. The government cross-examined the polygrapher, and the court also questioned him.

After the questioning was completed, the court stated:

> It was interesting to meet [the polygrapher] and hear his views. I still don't believe—let me put it this way, I believe that the rule of law which excludes polygraphs is the right one.

The court then found that the polygraph evidence Messina had offered was "flat out wrong."

The Federal Sentencing Commission has offered this policy statement:

> In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 6A1.3(a) (1995). Relying on that policy, Messina asks that we hold for the first time that polygraph evidence may be taken into account for sentencing purposes, and, accordingly, that we remand for consideration of such evidence.

Although the district court stated its belief in the correctness of our traditional rule against the admission of polygraph evidence, it also allowed Messina great latitude in presenting such evidence at his sentencing hearing. And, it made a factual finding that the test results Messina offered were "flat out wrong." In view of the fact that we have not decided whether polygraphy has reached a sufficient state of reliability to be admissible under Rule 702 of the Federal Rules of Evidence, *see United States v. Kwong*, 69 F.3d 663, 668–69 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996), we cannot say that the district court clearly erred in finding that the polygraph evidence actually presented was unworthy of credit. For that reason, we affirm its decision without reaching the question of whether the district judge would have been entitled to rely on the polygraph evidence for sentencing purposes if he had found it to be credible.

## V. Factual Findings for Sentencing Enhancements

■ . Finally, Messina argues that the district court erroneously imposed enhancements for obstruction of justice, *see* U.S.S.G. § 3C1.1; abduction, *see* U.S.S.G. § 2B3.2(b)(5)(A); and display of a firearm, *see* U.S.S.G. § 2B3.2(b)(3)(A)(iii), without making factual findings to support them. While Messina made generalized objections to the enhancements, he, with one exception, did not complain at the sentencing hearing about the court's factual determinations. He did argue that the court could not impose the firearm enhancement without first finding that the use of a firearm by the kidnappers was foreseeable to Messina. And, in response, the court made precisely such a finding.

The district court's holdings with respect to the enhancements were less specific than might be desirable. But, had objections been timely raised, more particularized findings might have been made. Under the circumstances, we conclude that the district court's factual determinations, together with the evidence offered, were sufficient to support the sentencing enhancements that the court saw fit to impose.

We have examined all of Messina's arguments and find them to be without merit.

The judgment of the district court is affirmed.