No. 77,100

STATE OF KANSAS, *Appellant,* v. STEPHEN MEDFORD SHIVELY, *Appellee.*
(999 P.2d 952)

Opinion filed March 10, 2000.

*Tony W. Rues,* assistant district attorney, argued the cause, and *Joel W. Mei-necke,* assistant district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellant.

*Craig H. Durham,* assistant appellate defender, argued the cause, and *Michael J. Helvey,* assistant appellate defender, and *Jessica R. Kunen,* chief appellate defender, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Following the trial, conviction, and sentencing of Stephen Medford Shively, the State appealed on questions reserved relating to a finding of indirect contempt against District Attorney Joan Hamilton and trial rulings regarding polygraph evidence.

Stephen Medford Shively was tried in April 1996 for intentional second-degree murder, aggravated assault on a law enforcement officer, and several drug-related charges. The charges arose from events occurring in October 1995 when Shively shot and killed Topeka Police Officer Tony Patterson during a night-time drug raid at Shively's home. Shively asserted the affirmative defense of defense of dwelling, and the trial court permitted polygraph evi-

dence to be admitted on that issue. Shively was acquitted of murder but was found guilty of aggravated assault and of all the drug charges.

The Court of Appeals affirmed all of Shively's convictions in *State v. Shively*, 26 Kan. App. 2d 302, 987 P.2d 1119 (1999), and we granted Shively's petition for review in that case (No. 78,380) on the single issue of "no knock search warrants." In a separate opinion filed this day, we have affirmed the Court of Appeals.

We consider the State's three contentions in the order raised.

## The Trial Court's Finding of Indirect Contempt

The first issue is whether the trial court correctly found District Attorney Joan Hamilton in indirect contempt of court under K.S.A. 20-1204a based on a letter she wrote to the editor of the Topeka Capital-Journal which was later published in that paper. In dealing with appeals by the State under K.S.A. 22-3602(b)(3), we have said:

"The purpose of permitting the State to appeal a question reserved is to allow the prosecution to obtain review of an adverse legal ruling on an issue of statewide interest important to the correct and uniform administration of the criminal law which otherwise would not be subject to appellate review." *State v. Schulze*, 267 Kan. 749, Syl. ¶ 1, 985 P.2d 1169 (1999).

We decline to exercise jurisdiction over the State's appeal of the trial court's ruling of contempt as a question reserved. This is *not* a matter which "otherwise would not be subject to appellate review." A trial court's judgment of contempt is reviewable under K.S.A. 20-1205, which provides that an appeal may be taken from any judgment of conviction for contempt in the same manner as is provided by law in civil cases. When a defendant attempted to raise refusal to cite police officers for contempt as an issue on appeal in *State v. Eldridge*, 197 Kan. 694, 703, 421 P.2d 170 (1966), *cert. denied* 389 U.S. 991 (1967), we held any review of such proceedings was limited by K.S.A. 20-1205 and could not be a specification of error in a criminal appeal. The same principle is applicable to the State's attempt here.

Additionally, appeals on questions reserved are not accepted merely to demonstrate error by the trial court, but are reserved for matters "of statewide interest important to the correct and uniform

administration of the criminal law." *State v. Schulze*, 267 Kan. 749, Syl. ¶ 1, 985 P.2d 1169 (1999). The State's arguments that the contempt ruling is procedurally flawed and incorrect on the merits fail to meet the above criterion. There is abundant case law regarding the procedural requirements for indirect contempt, see, e.g., *In re Seelke*, 235 Kan. 468, 471, 680 P.2d 288 (1984); *Johnson v. Johnson*, 11 Kan. App. 2d 317, 319-320, 721 P.2d 290 (1986); see also *State v. Holland*, 236 Kan. 840, 696 P.2d 401 (1985) (declining jurisdiction where resolution of issue would merely succeed in repeating the principles set forth in earlier cases), and a review of the merits of the contempt ruling would entail a fact-specific analysis not appropriate for review as a question reserved. See *State v. Chittenden*, 212 Kan. 178, 510 P.2d 152 (1973).

We decline to consider the contempt ruling.

## The Admission of Shively's Polygraph Evidence at Trial

The State argues that Shively's polygraph evidence was improperly admitted at trial. The trial court ruled that the polygraph technology presented in this case was sufficiently reliable and accepted within the scientific community to pass the test for admissibility enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Shively's arguments focused on the computerized scoring of his polygraph exam and claimed advances in polygraph technology. Although the rule denying admission of polygraph evidence is well established in Kansas and has been restated as recently as April 1999 in *State v. Wakefield*, 267 Kan. 116, 133, 977 P.2d 941 (1999), we address the claim that recent advances in computerized polygraph technology now make such evidence admissible.

Standard of Review

The general acceptance test of *Frye* governs the admissibility of expert scientific evidence in Kansas in those situations wherein such a test or standard is required. *State v. Isley*, 262 Kan. 281, Syl. ¶ 1, 936 P.2d 275 (1997). As explained in *State v. Warden*, 257 Kan. 94, 108, 891 P.2d 1074 (1995):

"The general rule enunciated in *Frye* prohibits expert testimony concerning a scientific principle or discovery unless the principle is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' *Frye*,

293 F. at 1014. This court has adopted the *Frye* test concerning the admissibility of scientific evidence. See *State v. Witte*, 251 Kan. 313, 836 P.2d 1110 (1992); *State v. Lowry*, 163 Kan. 622, 629, 185 P.2d 147 (1947).

" 'The *Frye* test requires that, before expert scientific opinion may be received in evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. If a new scientific technique's validity generally has not been accepted as reliable or is only regarded as an experimental technique, then expert testimony based on its results should not be admitted into evidence.' *Witte*, 251 Kan. 313, Syl. ¶ 3."

The party seeking to admit the scientific evidence has the burden of satisfying the *Frye* test by proving the reliability of the underlying scientific theory upon which the evidence is based and the acceptance of it in the appropriate scientific field. See *State v. Canaan*, 265 Kan. 835, 848-49, 964 P.2d 681 (1998); *Warden*, 257 Kan. at 108.

Although an abuse of discretion standard of review generally governs the admissibility of evidence, including expert testimony, *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999); *Simon v. Simon*, 260 Kan. 731, Syl. ¶ 1, 924 P.2d 1255 (1996), we review a trial court's *Frye* ruling de novo because the outcome of a *Frye* holding transcends individual cases such that applying less than a de novo standard could lead to inconsistent treatment of similarly situated claims. See *State v. Tankersley*, 191 Ariz. 359, 365, 956 P.2d 486 (1998); *Williams v. State*, 710 So. 2d 24, 32 n.13 (Fla. Dist. App. 1998); *Smith v. Belle Bonfils Mem. Blood Center*, 976 P.2d 344, 346 (Colo. App. 1998) (noting trial court's discretion in ruling on admissibility of evidence but stating that whether general acceptance exists under *Frye* is a question of law subject to de novo review); *Commonwealth v. Vao Sok*, 425 Mass. 787, 797, 683 N.E.2d 671 (1997) (applying de novo standard to *Frye* aspect of Massachusetts' unique test for admissibility).

## The Polygraph Evidence and Ruling in this Case

Key to Shively's defense to the charge of second-degree murder was his claim of defense of his dwelling. The police attempted to enter Shively's home for a surprise drug raid at around 3 a.m. by battering down two doors to the front entrance of his residence. Shively testified that he was awakened by the noise and ran with

gun in hand toward the front foyer to investigate. Through a broken panel in the door he saw shadowy figures trying to break in, at which time he fired his gun in the general direction of these individuals, killing Officer Patterson. It was the State's contention that Shively knew it was the police when he fired his weapon. Officer McKinley testified that he yelled, "Police, search warrant," during a pause in the battering of the second door and before Shively fired. Shively claimed he did not hear the police declare their identity and did not know it was the police when he fired his weapon.

Shively took a polygraph examination regarding whether he knew it was the police when he fired his weapon, and he sought to introduce the results, initially for purposes of bond reduction, then for the preliminary hearing, and later, at trial. The State objected to admission of the polygraph evidence, claiming it was inadmissible under the *Frye* test absent a stipulation by the parties and that it constituted hearsay testimony. The defense argued that the Kansas appellate courts had not considered a proffer of polygraph reliability evidence for many years and that such evidence derived from 1995 technology would be admissible under *Frye*.

The trial court refused to admit the polygraph evidence for the bond and preliminary hearings but permitted the defense to make a proffer which included: the testimony of polygraph examiner Gary Davis; the written declaration of polygraph expert and proponent David C. Raskin, Ph.D. (hereinafter Raskin Declaration); a copy of a study entitled "A Study of the Validity of Polygraph Examinations in Criminal Investigation, Final Report to the National Institute of Justice," May 1988, by David C. Raskin *et al.* (hereinafter Study); and "A Compendium on Polygraph Validity" by Norman Ansley. The test results were proffered in camera.

## The Pretrial and Trial Rulings

In making its pretrial ruling on the bond reduction request and preliminary hearing, the court stated the evidence would comply with *Frye*, but that the hearsay problem remained; Shively's motion for admission of the evidence was, therefore, denied. The issue resurfaced on a surprise basis at trial when counsel for the defense

mentioned the polygraph examination during opening statements to the jury. The State asked for a mistrial. The defense argued that because Shively was going to testify at trial, the hearsay objection no longer existed and the evidence was, therefore, admissible. The court at first sustained the State's objection but declined to order a mistrial. The court later revisited the issue and decided to permit the polygraph evidence at trial for purposes of corroboration. With regard to the *Frye* test, the court stated:

"[I]n my judgment, even if we were to adhere to the older . . . *Frye* test, I *believe the current standards of the scientific community in regard to the polygraph examination which was conducted by the defense experts would also be met.* . . .

". . . Counsel for defense have assured the Court that the defendant will be testifying, and there are several cases that I have been able to discover that talk about the . . . polygraph being admitted . . . to impeach the credibility of prior inconsistent statements.

"Now, these tests still don't in Kansas allow the . . . results of the polygraph. But it seems to me that . . . the . . . results of the polygraph in this case as an affirmation or corroboration of the defendant's testimony should be allowed. . . .

"Two other things occur to the Court that will act as safeguards in this matter. And that is that the State has had an opportunity to have the defendant examined under a polygraph and has the results and has experts available to—if necessary, or whatever they found, that may conflict with the defense polygraph testimony. So, . . . I think . . . that's a check. And that can be utilized by the State.

"Additionally, I believe that a proper jury instruction can be formulated . . . to apprise the jury . . . that they should not . . . blindly rely on the expert as a conclusive fact-finder, but they should weigh that evidence along with all of the evidence in the case.

"So, . . . for that limited purpose, and with those . . . prophylactic measures, . . . I will allow the polygraph evidence." (Emphasis added.)

The State reiterated its position against the polygraph evidence and lodged an objection to be noted for an appeal on a question reserved. The court allowed the State to endorse John Green, a polygraph examiner who conducted a second polygraph examination of Shively for the State. The court later clarified its ruling, stating that it would allow general test results to come in at trial, but not specific questions or answers. The trial court's limitations on the evidence were based on approaches taken in two federal

cases: *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir. 1989), and *United States v. Crumby*, 895 F. Supp. 1354 (D. Ariz. 1995).

Davis was allowed, over a continuing objection, to testify at trial regarding his credentials, the theory of the polygraph, the equipment and methodology, and to a 90% overall estimated accuracy. He stated that during the pretest interview, Shively related his "version of the relevant events." The jury was *not* told *what* version of events Shively gave to Davis during the interview or whether it differed from Shively's testimony at trial. The jury was told that Shively discussed with Davis *whether* he knew there were police officers on the other side of the door at the time he fired his weapon, and the results from the data were stated to be "consistent with and indicative of a truthful polygraph test outcome with regard to the facts given [to Davis] by Mr. Shively and the relevant questions."

In rebuttal, the State called Kansas Bureau of Investigation (KBI) Special Agent Supervisor John Green. Green used a non-computerized Lafayette Fact-Finder polygraph to test Shively as to whether he was aware it was the police when he fired his weapon. Green found the results inconclusive and also rescored the data from Shively's examination by Davis, which he also found inconclusive.

Analysis:

In most states polygraph evidence is either per se inadmissible in trials or is only admissible by stipulation, see *United States v. Scheffer*, 523 U.S. 303, 311, 140 L. Ed. 2d 413, 118 S. Ct. 1261 (1998), and *State v. Porter*, 241 Conn. 57, 124-25, 698 A.2d 739 (1997), *cert. denied* 523 U.S. 1058 (1998). Polygraph evidence has long been inadmissible in criminal trials in Kansas absent a stipulation by the parties. See *State v. Lassley*, 218 Kan. 758, 760, 545 P.2d 383 (1976).

*Frye* itself involved an early version of the lie detector, called the "systolic blood pressure deception test," in which changes in blood pressure were gauged. The underlying theory was the same as that for the present-day polygraph. The evidence in *Frye* was found inadmissible because the test had "not yet gained such stand-

ing and scientific recognition among physiological and psychological authorities as would justify" admitting expert testimony on it. 293 F. at 1014.

Kansas first considered lie detector evidence in *State. v. Lowry*, 163 Kan. 622, 185 P.2d 147 (1947). The machine in *Lowry* consisted of a blood pressure cuff on the arm and a rubber tube to track respiration. Data from these attachments was registered by a pivoting ink pen on moving graph paper. This court stated that the practical effect of the testimony was to present "a mechanical device—as reported by the operator—a sort of witness in absentia on the question of the defendant's guilt or innocence." 163 Kan. at 627. Our opinion noted several reasons supported a rule disapproving admission of such evidence, including that the function of cross-examination would be impaired because, although the examiner could be cross-examined as to his or her qualifications, methods, etc., "the machine itself—conceding the comparatively high percentage record as to accuracy and reliability claimed for it—escapes all cross-examination." 163 Kan. at 627. We recognized the utility of the lie-detector in some circumstances, such as when used by law enforcement agencies conducting criminal investigations, but expressed concern that persons of varying sensitivity might react to questions in unpredictable ways. The court was "not ready to say that the lie-detector has attained such scientific and psychological accuracy, nor its operators such sureness of interpretation of figures on a dial that the testimony . . . in question was competent, over objection, for submission to a jury . . . ." 163 Kan. at 628.

Kansas appellate courts after *Lowry* have continued to disallow polygraph evidence in trials absent a stipulation of the parties. In so doing, we have noted the unreliability of the results in accurately measuring truthfulness and deceit, and that such evidence invades the unique role of the jury as truthfinder. *Wakefield*, 267 Kan. at 133. We have continued to voice concern about the weight a jury might place on such evidence. *State v. Martin*, 237 Kan. 285, 293, 699 P.2d 486 (1985). It has also been said that polygraph evidence is considered inadmissible because the polygraph does not "automatically and unerringly" disclose a lie and cannot be considered

sufficiently accurate because of the human elements involved, including the psychological and emotional makeup of the examinee and the competence of the examiner. *State v. Blosser*, 221 Kan. 59, 60-61, 558 P.2d 105 (1976).

The State relies on the above reasons for exclusion and asserts that the computerized aspect of the polygraph has done nothing to increase its reliability under *Frye*. Shively, on the other hand, argues that polygraph evidence, particularly when produced on a computerized polygraph like the one used in this case, passes the *Frye* test for general acceptability and that the other related reasons stated in Kansas cases for excluding polygraph evidence are either not valid or not applicable in this case.

Both types of polygraphs operate on the same theory that certain stimuli, such as giving a deceptive answer to a threatening test question during a polygraph examination, produce involuntary changes controlled by the autonomic nervous system which can be recorded by the polygraph and deciphered to reveal truth and deception. See Raskin Declaration, 2. The computerized and traditional polygraphs measure essentially the same physiological parameters: Both use attachments across the chest and abdomen to measure thoracic and abdominal respiration; finger sensors to record the ability of the skin to either conduct or resist electricity; and a cardiosphygmomanometer or blood pressure cuff on the arm to record blood pressure. Both instruments permanently record the physiological data transmitted from the attachments, but the traditional instrument records the data by ink traces placed on moving paper that passes through the instrument as questions are asked and answered, whereas the computerized instrument records the data on a computer disc, which can later be used to print out graphs similar to those generated automatically by the traditional instruments.

Several companies market a computerized polygraph, and such polygraphs use an algorithm developed either by Raskin and John C. Kircher, Ph.D., or by Johns Hopkins University. The software uses the algorithm to evaluate the physiological data gathered. Davis used a Stoelting computerized polygraph with the Raskin-Kircher algorithm. After the test is completed, the polygraph charts

are evaluated to determine if the pattern of physiological reactions indicates truthfulness or deception to the relevant questions. This is done by systematically comparing the strength of reactions to the relevant and control questions to determine if the reactions were consistently stronger to one or the other. Raskin Declaration, 2-4. Critiques about the subjective nature of polygraph scoring often center on the possibility that individual examiners may assign different scores to the same test data. Note, *Polygraph Evidence in Federal Courts: Should it be Admissible?*, 36 Am. Crim. L. Rev. 87, 93 (1999). Computer scoring aims at diminishing this subjective element. See 36 Am. Crim. L. Rev. 87, 93. The Raskin-Kircher computerized polygraph system records the data, and then the computer algorithm analyzes the data and provides a score. The results are expressed in terms of the probability that the subject was truthful or deceptive in answering the relevant questions. The algorithm compares data from the control and relevant questions, and provides the relative strength magnitude of reaction between question times along with a graph, the data, and a score sheet for manual scoring. Because a computer is reading and analyzing the data using a set algorithm, the subjective element present when different examiners score the same charts is said to be removed; *i.e.*, the same scoring methodology (the one in the algorithm) is used every time.

Davis also performed a manual numerical scoring of Shively's charts. He testified that both the computer-based scoring and the examiner-based numerical scoring are generally accepted as reliable in the field of polygraphy, and that the equipment and methodology he used are generally accepted within the psychophysiology and polygraphy community. According to Davis, polygraph results derived from the general methodology (*i.e.*, the same control question test, etc.) he used are generally accepted as reliable by polygraph examiners, psychophysiologists, and a substantial part of the psychology community.

Davis testified to a roughly 90% accuracy rate for polygraphs based on studies over the years. However, the method of evaluation undertaken by an examiner can be significantly different from that used by a computer algorithm; research done on control question

tests scored by examiners does not necessarily validate an evaluation using a computer algorithm. See Giannelli, *Polygraph Evidence: Post-Daubert*, 49 Hastings L.J. 895, 922 (1998). In *The Current Status of Research in Forensic Psychophysiology and Its Application in the Psychophysiological Detection of Deception*, 40 J. Forensic Sci. 63, 64-65 (1995), the author, William J. Yankee, Director of the Department of Defense Polygraph Institute, described the limited data available on the accuracy of the Raskin-Kircher algorithm as a diagnostic tool and cautioned that all aspects of the computerized psychophysiological detection of deception are still in the developmental stages, necessitating cautious scrutiny.

Shively proffered no evidence that computerized polygraphs or computerized polygraph scoring is somehow more accurate than more traditional polygraphs. In fact, one of the studies in Shively's proffer concluded that the original examiners using numerical scoring tended to achieve greater accuracy than computerized scoring and theorized that the live examiners were influenced by case information and behavioral observations which eluded the computer. Study, at 39. Case information and behavioral observations of a witness during testimony constitute the very kind of evidence we expect jurors to evaluate—again illustrating why polygraph evidence is disapproved as tending to invade the province of the jury. Other than unsupported statements from Davis and Raskin, Shively presented no data on the accuracy of computerized polygraph systems as opposed to other polygraphs.

Computerized polygraphs and computerized scoring have been mentioned in very few cases and only in a limited fashion. In *United States v. Galbreth*, 908 F. Supp. 877 (D. N.M. 1995), the court applied the test in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 1131 S. Ct. 2786 (1993), for admissibility, and, relying greatly on the testimony of Raskin, found the polygraph evidence in that case admissible. The court was impressed by the asserted objectivity of computer scoring and with the computer's ability to perform thousands of calculations in a few seconds. Little else was said to validate the computerized scoring in that case. See also *State v. Council*, 335 S.C. 1, 19-20, 24, 515

S.E.2d 508 (1999), *cert. denied* 145 L. Ed. 2d 489 (1999) (Johns Hopkins algorithm used; applying test similar to that stated in *Daubert* and affirming trial court's ruling of nonadmissibility based on unreliability of polygraphs); *Porter,* 241 Conn. at 102, 115 (noting computers are used to give more precise numerical scores, but holding evidence per se inadmissible).

Despite Davis' assertion to the contrary, polygraph evidence is not generally accepted as reliable in the relevant scientific community. See Iacono and Lykken, *The Validity of the Lie Detector: Two Surveys of Scientific Opinion,* 82 J. Applied Psych. 426, 428-30 (June 1997) (nearly three-fourths of the respondents in surveys of members of the Society for Psychophysiological Research and Fellows of the American Psychological Association stated that they would not advocate the admission in court to a jury of evidence from a polygraph examiner as to his or her opinion of the defendant's truth or deception based on control question polygraph techniques). While some courts have stated that the control question polygraph is generally accepted, see, *e.g., Galbreth,* 908 F. Supp. at 892, several other courts considering either *Frye* or the *Frye* component of the *Daubert* test have determined it is not generally accepted as reliable in the relevant scientific community. See, *e.g., United States v. Cordoba,* 194 F.3d 1053, 1060-62 (9th Cir. 1999); *Commonwealth v. Mendes,* 406 Mass. 201, 202, 207-210, 547 N.E.2d 35 (1989); *State v. Crosby,* 927 P.2d 638, 642-43 (Utah 1996); *State v. Carlson,* 80 Wash. App. 116, 123, 906 P.2d 999 (1995); and *State v. Beard,* 194 W. Va. 740, 747, 461 S.E.2d 486 (1995).

Particularly noteworthy on this issue are recent comments by the United States Supreme Court in *Scheffer,* 523 U.S. 303, where the Court examined a challenge to a per se ban on polygraph evidence by Military Rule of Evidence 707. In holding such a per se ban is not unconstitutional, the Court noted the lack of consensus regarding polygraph evidence:

"State and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial. . . .

"The contentions of respondent and the dissent notwithstanding, there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques: 1 D. Faigman, D. Kaye, M. Saks, & J. Sanders, Modern Scientific Evidence 565, n. +, § 14-2.0 to § 14-7.0 (1997); see also 1 P. Giannelli & E. Imwinkelried, Scientific Evidence § 8-2(C), pp. 225-227 (2d ed. 1993) . . . ; 1 J. Strong, McCormick on Evidence § 206, p. 909 (4th ed. 1992) . . . . Some studies have concluded that polygraph tests overall are accurate and reliable. See, *e.g.*, S. Abrams, The Complete Polygraph Handbook 190-191 (1989) (reporting the overall accuracy rate from laboratory studies involving the common 'control question technique' polygraph to be 'in the range of 87 percent'). Others have found that polygraph tests assess truthfulness significantly less accurately—that scientific field studies suggest the accuracy rate of the 'control question technique' polygraph is 'little better than could be obtained by the toss of a coin, ' that is, 50 percent. See Iacono & Lykken, The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests, in 1 Modern Scientific Evidence, supra, § 14-5.3 at 629 . . . .

"This lack of scientific consensus is reflected in the disagreement among state and federal courts concerning both the admissibility and the reliability of polygraph evidence. Although some Federal Courts of Appeals have abandoned the *per se* rule excluding polygraph evidence, leaving its admission or exclusion to the discretion of district courts under *Daubert*, see, *e.g.*, *United States v. Posado*, 57 F.3d 428, 434 (C.A. 5 1995); *United States v. Cordoba*, 104 F.3d 225, 228 (C.A.9 1997), at least one Federal Circuit has recently reaffirmed its *per se* ban, see *United States v. Sanchez*, 118 F.3d 192, 197 (C.A.4 1997), and another recently noted that it has 'not decided whether polygraphy has reached a sufficient state of reliability to be admissible.' *United States v. Messina*, 131 F.3d 36, 42 (C.A.2 1997). Most states maintain *per se* rules excluding polygraph evidence. See, *e.g.*, *State v. Porter*, 241 Conn. 57, 92-95, 698 A.2d 739, 758-759 (1997); *People v. Gard*, 158 Ill. 2d 191, 202-204, 632 N.E.2d 1026, 1032 (1994); *In re Odell*, 672 A.2d 457, 459 (R.I. 1996) *(per curiam)*; *Perkins v. State*, 902 S.W.2d 88, 94-95 (Ct. App. Tex. 1995). New Mexico is unique in making polygraph evidence generally admissible without the prior stipulation of the parties and without significant restriction. See N.M. Rule Evid. § 11- 707. [FN8] Whatever their approach, state and federal courts continue to express doubt about whether such evidence is reliable. See, *e.g.*, *United States v. Messina, supra*, at 42; *United States v. Posado, supra*, at 434; *State v. Porter, supra*, at 126-127, 698 A.2d, at 774; *Perkins v. State, supra*, at 94; *People v. Gard*, supra, at 202-204, 632 N.E.2d, at 1032; *In re Odell, supra*, at 459.

"[FN8.] Respondent argues that because the Government—and in particular the Department of Defense—routinely uses polygraph testing, the Government must consider polygraphs reliable. Governmental use of polygraph tests, however, is primarily in the field of personnel screening, and to a lesser extent as a tool in criminal and intelligence investigations, but not as evidence at trials. See Brief for

United States 34, n. 17; Barland, The Polygraph Test in the USA and Elsewhere, in The Polygraph Test 76 (A. Gale ed. 1988). Such limited, out of court uses of polygraph techniques obviously differ in character from, and carry less severe consequences than, the use of polygraphs as evidence in a criminal trial. They do not establish the reliability of polygraphs as trial evidence, and they do not invalidate reliability as a valid concern supporting Rule 707's categorical ban.

"The approach taken by the President in adopting Rule 707—excluding polygraph evidence in all military trials—is a rational and proportional means of advancing the legitimate interest in barring unreliable evidence. Although the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams." 523 U.S. at 309-12.

Several of these comments from *Scheffer* were described with approval in *Wakefield*, 267 Kan. at 135, where we reiterated our doubts as to the reliability of polygraph examinations and affirmed a trial court's exclusion of such evidence. Such comments and case law, considered along with the results of the Iacono and Lykken surveys, make clear that the common control question polygraph examination used in the present case is not generally accepted as reliable in the relevant scientific community, despite the trial court's ruling to the contrary.

Moreover, the other concerns about polygraph evidence (that juries may place undue weight on it and that it stands as a kind of witness in absentia on the question of whether a witness is telling the truth, usurping the role of the jury) remain valid. Citing Peters, *A Survey of Polygraph Evidence in Criminal Trials*, 68 A.B.A. J. 162 (1982); Markwart and Lynch, *The Effect of Polygraph Evidence on Mock Jury Decision-Making*, 7 J. Police Sci. & Adm. 324, 325, 330 (1979); and Carlson, Pasano, and Jannuzzo, *The Effect of Lie Detector Evidence on Jury Deliberations: An Empirical Study*, 5 J. Police Sci. & Adm. 148, 153-54 (1977), Shively argues that juries do not place undue reliance on polygraph evidence, and he notes that the trial court instructed the jury to weigh the polygraph evidence like any other evidence and not to take it as conclusive proof of truthfulness or untruthfulness. We do not agree that these studies or the trial court's cautionary statements to the jury warrant a change in the longstanding rule. Each of these studies suffers from

numerous empirical limitations. At most they suggest the need for further research. We are not convinced that we should back away from our previously stated concerns about the possible undue influence of polygraph evidence on jurors. We remain committed to the manner in which we have decided this issue since 1947. We point to the extensive and well-reasoned discussion of the pitfalls of polygraph evidence found in *Porter*, 241 Conn. at 92-132, as setting forth both sides of the controversy considered in this opinion. After an exhaustive analysis in *Porter*, the Supreme Court of Connecticut declined, as we do today, to abandon its rule against the admissibility of polygraph evidence.

Shively also asserts that the usual concerns over polygraph evidence were alleviated in this case by the trial court's "precautions" (derived from *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir. 1989), and *Crumby*, 895 F. Supp. 1354) of only allowing the polygraph testimony for corroboration and of only allowing Davis to testify that Shively's exam was generally indicative of a truthful test outcome regarding the relevant questions, without discussion of the specific questions, responses, or the probable truthfulness or deception of the responses to particular questions. We disagree. In fact, this method of limitation actually complicates the problem by requiring the jury to speculate as to what Shively said during his pre-test interview and as to what was asked in the test questions that Shively supposedly answered truthfully. Such evidence gave the jurors the general impression that Shively's out-of-court version of events was consistent with his in-court version, but the jury was never actually told this and was therefore unable to directly evaluate exactly what Shively said when he was being "truthful." This served only to inject speculation into the trial, with little offsetting value as to the quality of the information actually being conveyed. This court has previously held that even the fact that an examination was taken or that there was an offer to take one is not admissible, *State v. Webber*, 260 Kan. 263, 276, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997). The "limited" polygraph evidence that was allowed in this case was equally inadmissible.

Although the *Piccinonna* parameters for admitting polygraph evidence solely for purposes of corroboration or impeachment were

discussed in *Wakefield*, 267 Kan. at 134-35, they were not adopted. They were discussed only because the defendant in *Wakefield* cited *Piccinonna* to argue for reconsideration of our position on polygraph evidence. 267 Kan. at 133-34. We merely observed in *Wakefield* that, even under a *Piccinonna* rationale, Wakefield's polygraph results would not have been admissible.

Shively's 6th Amendment Claim.

Shively also argues that a defendant's 6th Amendment right to present witnesses in his or her defense requires the admission of expert polygraph evidence to bolster his or her credibility. Such a claim was analyzed and rejected in *Scheffer*, 523 U.S. 303, 315-17. Shively's arguments on this point cover the same ground as those in *Scheffer*, and we too reject such a claim.

We hold the trial court erroneously admitted Shively's polygraph test results. As to this issue, the State's appeal is sustained.

**The Trial Court's Refusal to Permit the State to Introduce the McKinley Polygraph Results**

The State also argues that once the trial court admitted Shively's polygraph evidence, the court abused its discretion by not permitting the State to introduce evidence of its polygraph examination of Officer McKinley on the subject of whether McKinley announced the presence of the police prior to Shively firing his weapon. The McKinley polygraph was no more admissible than the Shively polygraph as a matter of law. We will not consider the State's arguments on this issue because the trial court's ruling was correct notwithstanding the underlying reasons for its decision. *State v. Donlay*, 253 Kan. 132, 134, 853 P.2d 680 (1993).

The State's appeal as to this issue is denied.

Jurisdiction on the issue of indirect contempt is denied. The State's questions reserved regarding polygraph evidence are sustained in part and denied in part.